Dennis P. Orr (DO 6488)
A. John P. Mancini (AJPM 5829)
Stefan W. Engelhardt (SE 0055)
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

SIT-UP LIMITED,                           :
                                          :
        Plaintiff,                        :
                                          :
             v.                           :        Civil Case No. _____
                                          :
IAC/INTERACTIVECORP and                   :
HSN INTERNATIONAL,                        :
                                          :        **COMPLAINT FOR PRELIMINARY**
        Defendants.                       :        **INJUNCTION AND OTHER RELIEF**
-----------------------------------------------------x

Plaintiff sit-up Limited ("sit-up"), by and through its attorneys, Mayer, Brown, Rowe &

Maw LLP, for its complaint against defendants IAC/InterActiveCorp and its subsidiary, HSN

International (collectively, "IAC" or "defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      Failing in its attempt to acquire sit-up and its innovative and unique "bid.tv" and

"price-drop tv" channels at a woefully insufficient price, IAC instead exploited sit-up's highly

confidential and propriety information – aptly described to IAC as the key ingredients to sit-up's

"secret sauce" – that was carefully disclosed to IAC only pursuant to a strict non-disclosure

agreement governed by New York law.  These valuable trade secrets, developed by sit-up's

founders through years of human ingenuity, creativity, and trial-and-error, were unjustly co-

opted by IAC and used to launch a copycat "falling-price" auction channel in the United

Kingdom, placing in grave danger sit-up's first-mover advantage in the United States. This action for misappropriation of trade secrets, breach of contract, unfair competition, and misappropriation of an idea seeks (i) preliminary and permanent injunctive relief to prevent the launch of any falling-price or rising-price auction channel by IAC in New York, (ii) damages arising from IAC's use of trade secret material in violation of the non-disclosure agreement, and (iii) an order directing IAC to account for any trade secret material used by IAC or disclosed to third parties.

2.      In the wake of IAC's launch of its competing falling-price auction channel (and just months following IAC's termination of negotiations with sit-up), Barry Diller, Chief Executive of IAC, described IAC's business philosophy in these terms: ***"We invent nothing. We exploit. We recognize opportunity."*** And so it is here.

3.      Recognizing an "opportunity" to share in the success of sit-up's unique and innovative falling-price auction channel, in July 2003 Diller's IAC commenced negotiations to purchase sit-up and its key assets, including its enormously successful and novel price-drop tv channel.

4.      This dynamic pricing channel was the first of its kind in the world, combining video and entertainment with the concept of a falling-price auction where the price falls as the quantity of the product drops, with each purchaser paying the same lowest closing price when the remaining quantity reaches zero. This unique and innovative twist on the mundane retail model attracted the highly coveted demographic of young, male, mid-market consumers and became sit-up's most popular – and lucrative – channel. The falling-price auction concept thus had enormous potential in the U.S. market, a fact that IAC acknowledged repeatedly to sit-up.

5.      But what appeared in July 2003 to be good faith negotiations for the purchase of sit-up took a dramatic turn when, upon information and belief, IAC eventually began surreptitiously developing its own falling-price auction channel while at the same time requesting and receiving highly confidential and proprietary trade secrets that included, among other things, sit-up's business models (with their underlying assumptions and graphical representations), five-year business plans, pricing and inventory measurement tools, schedules detailing sit-up's historical and anticipated product and price mix (including minimum price information, target selling price information, and product attributes), the detailed terms of sit-up's distribution deals, and information concerning the impact of telephony and "postage and packing" profits on the unprecedented success of price-drop tv.

6.      Indeed, as late as December 2004 – a mere four months before launching its own, identical version of price-drop tv and while continuing to feign interest in acquiring sit-up – IAC sought and received additional trade secret material that, together with the trade secret material confidentially disclosed to IAC since July 2003, helped solve the mystery of how sit-up was able to generate significant profits in a world of falling prices. Upon information and belief, IAC used that trade secret material to decide to launch a falling-price channel and to build its own business model, albeit while giving the false impression that the business model would be used to evaluate a potential acquisition of sit-up.

7.      After having received virtually all the trade secret information it requested, IAC terminated negotiations with sit-up in December 2004 and did what its own Chief Executive acknowledged it does best – namely, it "invented nothing" and instead "exploit[ed]" sit-up's priceless trade secret material.

3

8.     In blatant violation of the non-disclosure agreement, upon information and belief IAC stole sit-up's trade secret material and copied in only three months what sit-up's founders spent years of trial-and-error developing.  After huge expenditures of intellectual capital that culminated in the creative expression and tremendous commercial success of price-drop tv, sit-up discovered – without any notice from IAC – that its proprietary business model, its pricing measurement tools, and its other invaluable intellectual property had been exploited by IAC to create an identical falling-price auction channel only months after IAC was actively requesting and receiving trade secret material from sit-up and negotiating for the purchase of the company.

9.     Upon information and belief, IAC launched its competing falling-price auction channel, iBuy, with one principal goal in mind – namely, using the U.K. launch as a trial run for IAC's eventual launch of a falling-price auction channel in the United States, a result that would irreparably harm sit-up by destroying its hard-earned, first-mover advantage in the United States.

10.     Upon information and belief, John Watson, the COO of HSN, and other individuals who negotiated the potential acquisition of sit-up and who received the trade secret material were instrumental in the launch of iBuy.  It is thus hardly surprising that iBuy was identical to price-drop tv in all material respects – auction format, presentation style, use of a single presenter (with movements identical to price-drop tv's presenters), nomenclature (including direct lifts from price-drop tv of "price plunge," "everyone pays the lowest price," and other catch-phrases), graphics, previews, delivery promises, and return policies.

11.     But without the trade secrets acquired by IAC during its 16-month education into the intricacies and underpinnings of sit-up's business model, IAC could not have launched a competing channel in April 2005.  Nor could IAC – with its massive buying power in the United States, its developed U.S. infrastructure (warehousing and call center facilities, etc.), and its

4

enormous distribution potential for iBuy in the United States as a result of its ownership of HSN – have threatened to undermine sit-up's first-mover advantage in the United States.

12.    During the acquisition negotiations, it became clear to sit-up that IAC's true design for the contemplated acquisition was to continue to "test market" the falling-price auction concept in the U.K. for eventual roll-out to the larger, more profitable United States.  Given the recent launch of iBuy, that strategy now presents a clear and imminent threat to sit-up's own plans to launch into the U.S. marketplace.

13.    This action seeks to recover damages from IAC's misappropriation of trade secrets, its breach of the non-disclosure agreement, its unfair competition and its misappropriation of sit-up's novel ideas, and preliminary and permanent injunctive relief to prevent IAC's continued exploitation of sit-up's intellectual property in New York.

## PARTIES

14.    Plaintiff sit-up Limited ("sit-up") is a corporation organized and existing under the laws of the United Kingdom with its principal place of business at sit-up House, 179-181 The Vale, London.  sit up is engaged in the television retailing business.

15.    Defendant IAC/InterActiveCorp is a corporation organized under the laws of Delaware and having its principal place of business at 152 West 57th Street, New York, New York.  IAC operates a portfolio of specialized brands in the travel, retailing, ticketing, personals, media, financial services, real estate and teleservices industries.

16.    Defendant HSN International ("HSN") is a subsidiary of IAC organized under the laws of Delaware, and having its principal place of business in St. Petersburg, Florida.  HSN is a global multi-channel television retailer.

## JURISDICTION AND VENUE

17.     Jurisdiction for this action arises under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiff and the defendants, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

18.     Venue in this District is proper under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claim occurred in this District, including, among other things, negotiations between sit-up and IAC for the potential acquisition of sit-up, negotiations between IAC and a major New York-based shareholder of sit-up, Alpine Capital, for the potential acquisition of sit-up, IAC's theft of sit-up's trade secrets, IAC's use of sit-up's trade secrets, and IAC's development of a competing falling-price auction channel.

## FACTUAL ALLEGATIONS

### I.     sit-up and the Concept of the Falling-price Auction

19.     Founded in 1999, sit-up is a television retailing business whose founders created and developed an interactive screen commerce channel, bid.tv.

20.     bid.tv was the world's first auction channel, launched in November 2000 as a rising price auction channel in which every winner pays exactly what he bids.  It has become a mainstream, proven retail concept that combines a business-to-consumer model driven by an equally mainstream retail proposition of significant savings.

21.     As early as October 2000, sit-up experimented with a new type of auction channel – a falling-price auction – with the goal of appealing to a new and highly coveted group of customers.  Among other things, sit-up invested substantial amounts of time, money and intellectual capital researching this new concept and developing and refining its ideas through extensive work with consumer focus groups.

6

22.     By 2002, sit-up's founders had an inspiration for a falling-price dynamic format where every purchaser wins at the lowest price, regardless of when he joins the auction, or "sale". As contemplated and eventually realized by sit-up, the sale begins with two variables – price (*e.g.*, £50) and quantity (*e.g.*, 20 digital cameras) – with the price declining until the quantity of remaining products reaches zero. The price continues to drop until the full quantity of the offered product is sold. Notably, the last and lowest price (*e.g.*, £30) is the price at which *all* 20 buyers purchase the product (regardless of the price level at the time the customer joined the sale).

23.     The price, and to a large extent the length of the price drop, is controlled by a producer, who observes the auction from a closed-off, private control room. Through the use of complex, algorithm-based graphical representations, the producer guides the presenter through each individual auction in an effort to attain sit-up's "target price" for that particular auction. The producer is instrumental in ensuring that (i) the "price lock" – *i.e.*, the price at which the last product is sold – provides sufficient profit margin to sit-up, and (ii) the rate of price decline maximizes the customer "thrill" associated with a falling price auction, which is enhanced by the customer usually paying less than he was prepared to pay. Because sit-up guarantees to sell every product up for auction until the stocks of that product are depleted, there is always the possibility that customers will win the product at absurdly low prices, including as low as a single pound. The tension created by that possibility makes price-drop tv exciting for the viewer – perhaps prompting the viewer to "sit up" in his or her seat – and represents price-drop tv's most valuable quality: its seamless marriage of commerce and entertainment. That concept is unique to the world of retailing, and in totality constitutes sit-up's "secret sauce."

24.     Faced with the unique challenge of selling products at an unknown, continually falling price – in a tightly condensed, seven minute time span – sit-up's founders sought to develop a model that would transform this unfamiliar retail concept into a profitable business in the United Kingdom and, eventually, in the United States.

25.     In particular, sit-up, through substantial expenditures of intellectual capital, years of experimentation (which included running different variations of the falling-price model as early as the Fall of 2000), and hundreds of hours spent with consumer focus groups and studying the television experience, had to determine the rate at which the auction prices should fall, the average length of a price drop, the magnitude of a price drop, the number of price drops to run each hour/day, and the quantity of products to be sold in those price drops, taking into account, among other things, the target selling price, the product attributes, the time of day of the auction, the anticipated number of viewers, and the creation of maximum customer enthusiasm – the "secret sauce" – arising from the falling-price concept.

26.     sit-up's years of trial and error, its huge financial commitment (approximately $36,000,000), and the thousands of man hours spent developing price-drop tv's business model culminated in the successful launch of price-drop tv in June 2003.  Over its first three months alone, price-drop tv substantially exceeded sit-up's financial targets, including gross sales, product margin, product contribution, telephony contribution, and product and packaging contribution, and met its goal of targeting young, male consumers (half of the audience) without siphoning viewers from sit-up's other retail television ventures.  *Id.*  In its first year, price-drop tv turned over approximately $200,000,000 in sales, the most successful debut of any home shopping channel in the U.K., and possibly the world.  Its growth continued, but since IAC's launch of iBuy, sit-up has failed to meet its financial targets.

8

27.     That success was directly attributed to an extraordinary amount of human ingenuity and creativity that was reflected in, among other things, the following materials (collectively, "Trade Secret Material"):

    a.  Oral presentations and tutorials regarding the information contained in sit-up's Producer Process and Procedure Manual, a 140-page, highly confidential, step-by-step guide detailing (i) how the falling-price auction is to be operated; (ii) how the producer and presenters should handle certain on-air contingencies; (iii) what on-air terminology should be used during the auction; (iv) the nature of the presenter-producer relationship; and (v) the various camera angles for specific auction events, and providing sample profit logs, sample retail and scheduling logs, and procedures for accessing confidential schedules;

    b.  sit-up's business models, their underlying assumptions, and their core drivers;

    c.  graphical representation producer tools detailing the "perfect" falling-price auction and taking into account such factors as the length of the auction, the start price, the desired closing time, the average customer discount, and the target profit;

    d.  five-year business plans, including profit and loss forecasts, revenue analyses, anticipated revenue drivers, anticipated revenue per home figures, growth drivers, forecasted airtime and postage and packing revenue, margin analyses, sales mix analyses, overhead forecasts (including call center, warehouse and marketing overhead costs), customer returns percentages and anticipated distributor commissions;

e.  planning tools, including weekly sales stock and intake reports, range plans, and task lists, which, together, constitute the best expression of sit-up's 12-month purchasing expectations and needs;

f.  product performance reports;

g.  pricing and inventory measurement tools, including daily schedules detailing, by hour of auction time, the products expected to be sold, sit-up's cost per product, the target sales price, the minimum sales price, the quantity of products for sale, sit-up's anticipated profit in pounds, and the margin percentage;

h.  schedules detailing sit-up's historical product and price mix, including, among other things, information concerning product attributes, average selling price, total product sales, product mix percentages, total profits, and profits per unit;

i.  documents reflecting the impact of telephony and "postage and packing" profits on the unprecedented success of price-drop tv; and

j.  the terms of sit-up's distribution agreements with third parties.

28.    The Trade Secret Material was maintained confidentially by sit-up and was available only to (i) select company employees subject to strict confidentiality agreements, and (ii) two other third parties who both signed a non-disclosure agreement.  In addition, certain of the Trade Secret Material was password protected.

## II.    The Non-Disclosure Agreement and IAC's Access to Trade Secret Material

29.    In or around July, 2003, sit-up began speaking with potential suitors about the potential acquisition of sit-up, including its falling-price auction channel.

30.     IAC, a global multi-channel retailer that owns one of the largest cable television networks in the world and the second largest television retailer (Home Shopping Network), was one of those suitors.

31.     IAC was particularly attractive to sit-up because of its global reach and, in particular, its ability to open distribution channels in the United States through its Home Shopping Network and America's Store channels.  sit-up was equally attractive to IAC because, in the summer of 2003, IAC had yet to develop a falling-price (or, for that matter, rising-price) auction channel anywhere in the world, and sit-up had proven that the novel, dynamic-price concept could have substantial commercial success in the U.K. market with the potential for unprecedented success in the U.S. market.

32.     On or around July 1, 2003 (just after the successful launch of price drop tv), IAC, through John Watson, Chief Operating Officer of HSN, contacted sit-up regarding working toward a potential deal and engaged in informal discussions about sit-up, its interactive screen commerce channels, and the potential expansion of price-drop tv into the U.S. market.

33.     One month later, when discussions advanced and IAC requested highly confidential and proprietary information from sit-up – information that took years to develop and that revealed the very sources of sit-up's enormous success – the parties negotiated and executed a mutual non-disclosure agreement ("Non-Disclosure Agreement" or "NDA") to protect sit-up's intellectual property.

34.     That Non-Disclosure Agreement provides, in pertinent part, as follows:

> In order to pursue the mutual business purpose of a possible transaction between IAC and the Company [sit-up] and/or their affiliates (the "Transaction"), both IAC and the Company recognize that there is a need to disclose to one another certain information in respect of itself and its affiliates.  All such information, delivered by or on behalf of one party and its affiliates (the "Disclosing Party") to the other party (the "Receiving Party") or its Representatives (as defined below),

whether furnished before or after the date of this Agreement and regardless of the manner in which it is furnished, together with all analyses, compilations, studies or other documents or records prepared by the Receiving Party and its Representatives to the extent such analyses, compilations, studies, documents or records contain, otherwise reflect, or are generated from such information, is referred to herein as "Evaluation Material." In consideration of the opportunity to consider such Evaluation Material, both parties agree as follows:

1.      The Evaluation Material will be used by the Receiving Party and its affiliates, directors, officers, employees, advisors, agents, controlling persons, and financing sources or other representatives (collectively referred to as the "Representatives") *solely for the purpose of evaluating a possible Transaction*. Such Evaluation Material will be kept strictly confidential by the Receiving Party and its Representatives . . . .

(emphasis added).

35.     In July 2004, the parties extended the Non-Disclosure Agreement for an additional year, through September 1, 2005. The NDA is governed by New York law.

36.     Beginning in or about August 2003 (when price-drop tv had established itself as a bona fide consumer hit) and extending through December 2004, IAC and sit-up (and/or sit-up's investment bankers, Ingenious Corporate Finance, retained by sit-up in early 2004, and/or sit-up's New York based shareholder and board member) engaged in extensive discussions concerning all aspects of bid.tv and price-drop tv, including, among other things, price-drop tv's business model and its underlying assumptions, its revenue drivers, its optimal product and price mix, the sources of its high profit margin, and the "secret sauce" that generated maximum customer "thrill" in the falling-price dynamic.

37.     The parties also discussed often, and in detail, sit-up's demonstrated interest in distributing price-drop tv in the United States and IAC's recognition of the significant potential for such distribution. For example, in discussing potential U.S entry strategies, in a September 2003 meeting with sit-up, IAC touted its ability to distribute price-drop tv through an affiliate

12

channel, America's Store, which, according to IAC, targeted a more male demographic (as did price-drop tv) and was seen in more than 12 million U.S. homes.

38.    In a separate September 2003 meeting in the United States, HSN's own President echoed IAC's interest in expanding price-drop tv through America's Store, a sentiment reinforced by HSN's COO one week later.  Indeed, the prospect of price-drop tv's U.S. expansion was a topic in each of the parties' meetings, and was acknowledged by IAC.

39.    Upon information and belief, IAC intended to use price-drop tv to "test market" the falling-price auction concept in the U.K. for eventual roll-out to the larger, more profitable U.S. market.  Indeed, in discussions with the Chief Executive of another major home shopping channel regarding the then-recent launch of iBuy, he stated his opinion that "they [*i.e.*, IAC] must be doing it here [*i.e.*, in the U.K.] in advance of launching it in the U.S."

40.    IAC's 16-month tutorial came in various forms.  sit-up gave several formal and informal presentations to U.S. representatives of IAC beginning in July 2003 and continuing through July 2004.  The parties engaged in several face-to-face meetings in London and in the United States (including with HSN's President in the U.S.), during which sit-up walked IAC's U.S. representatives through highly sensitive and confidential documents and/or discussed sit-up's unique falling-price concept.  sit-up provided IAC with access to its data room, which contained equally confidential and proprietary documents, including detailed analyses of sit-up's intellectual property rights.  And the parties communicated extensively – and during certain periods, daily – by e-mail and telephone.

41.    During the course of IAC's evaluation of sit-up's business, IAC requested and received virtually all of the Trade Secret Material.

42.    For example, in October 2003, IAC's U.S. representatives requested and received sit-up's then-current version of its five-year plan.  On or about November 3, 2003, John Watson (IAC) requested that sit-up resend its business model to IAC "with the built in equations so that we can play around with it and understand the drivers of the model."  sit-up provided this material with the understanding that it would be used solely for the purpose of evaluating the potential acquisition of sit-up.

43.    Also in November 2003, under the guise of evaluating sit-up's business as a potential acquisition, IAC requested that sit-up fill in IAC-drafted spreadsheets with detailed assumptions underlying price-drop's business model and provide the detailed terms of sit-up's distribution agreements.  Again, sit-up complied with this request by specifically incorporating it into a revised five-year plan with the understanding – amply supported by the NDA – that the information would be maintained confidentially and used solely to evaluate a potential acquisition of sit-up.

44.    On or about November 17-18, 2003, four IAC representatives from the United States spent two days with sit-up "review[ing] . . . all the details and assumptions built into the 5 year plan."

45.    In February 2004, IAC's U.S. representatives requested and received sit-up's updated five-year plan (that was created, in part, specifically in response to the spreadsheets IAC had sent sit-up in 2003) which contained, among other things, profit and loss forecasts, revenue analyses, anticipated revenue drivers, anticipated revenue per home figures, forecasted airtime and postage and packaging revenue, customer returns percentages, margin analyses, sales mix analyses, overhead forecasts (including call center, warehouse and marketing overhead costs),

and anticipated distributor commissions.  This free-flow of information continued throughout the spring of 2004.

46.     In July 2004, a team of IAC's U.S. representatives, including its International Finance Director, Terry Curtis, and HSN's COO, John Watson, engaged in extensive diligence at sit-up's offices and were provided access to virtually all of sit-up's Trade Secret Material. During these meetings, Mr. Curtis revealed to sit-up that IAC was building its own financial model based on Trade Secret Material in order to, he claimed, evaluate the potential acquisition of sit-up.  sit-up spent many hours answering questions and specifically helping Mr. Curtis to build a model of sit-up's business on his laptop computer.  This meeting prompted an extension of the Non-Disclosure Agreement through September 1, 2005.

47.     Finally, throughout the negotiations, IAC asked numerous detailed questions about sit-up's business model, its financial assumptions, its customer profiles, its potential expansion into the U.S. market, and its revenue drivers, to which sit-up provided equally detailed responses.  In doing so, sit-up understood and told IAC on several occasions that the highly confidential and proprietary information that was the secret to price-drop's enormous success was being disclosed pursuant to the strict terms of the NDA.

**III.    IAC's Four-Month Silence Followed By Its Renewed "Interest" in the Trade Secret Material**

48.     On or about March 17, 2004, IAC made its first offer to purchase sit-up.  IAC's first offer was grossly insufficient and, as a result, was promptly rejected by sit-up.

49.     Negotiations continued through the Spring of 2004 and, in June 2004, IAC made a second offer for the purchase of sit-up that was below a competing offer received from sit-up's other suitor.  Despite being told that its offer was too low, IAC insisted on the right to do further

diligence work, and sent a team to London.  Following this due diligence exercise, sit-up

requested that IAC submit a revised offer, which IAC agreed to do in July 2004.

50.    On July 23, 2004 – just days after a team of IAC representatives conducted

extensive diligence and was again privy to, and received copies of, all of sit-up's Trade Secret

Material – IAC suddenly changed its course and notified sit-up that it would not submit a revised

bid, despite having said that it would do so earlier in the month.

51.    The July 23, 2004 contact was followed by four months of complete silence.  IAC

never contacted sit-up about the potential acquisition, never inquired about whether sit-up had

been sold, and, importantly, never returned the Trade Secret Material.

52.    It was not until late November 2004 that IAC informed sit-up, through one of sit-

up's New York-based shareholders, Alpine Capital, of its renewed "interest" in acquiring sit-up

and made additional, targeted requests for Trade Secret Material in order to – according to IAC –

meaningfully participate in the negotiations.

53.    That material included, among other confidential, proprietary, and highly detailed

trade secret information:  (i) updates on the actual and forecasted sales for 2004, (ii) updates on

sit-up's cost data for 2004, (iii) sit-up's 2005 budget, (iv) sit-up's distribution data (including

sales by distribution channel), (v) contract termination dates for all distribution agreements, (vi)

financial data from 2004, (vii) product category breakdowns by sales and margin, and (viii) sit-

up's organizational chart – information that is critical to any launch of a competing channel.

54.    Having no reason to suspect – at that time – that the same individuals evaluating

the potential acquisition of sit-up might actually have begun developing a competing falling-

price auction channel; that, upon information and belief, IAC was exploiting sit-up's Trade

Secret Material in violation of the NDA; or that, upon information and belief, IAC was

requesting such targeted information not to make an informed decision regarding the acquisition of sit-up, but rather to finalize its own plans for the upcoming launch of IAC's competing channel, sit-up promptly provided to IAC the bulk of the information requested.

55.     On December 2, 2004, IAC made one final request for Trade Secret Material (which sit-up provided that same day), offering no hint of IAC's plans to launch a competing channel by early Spring, 2005. That was the last sit-up heard from IAC.

## IV.     IAC's Launch of iBuy

56.     In April 2005, a mere four months after IAC requested and received Trade Secret Material under the guise of one day acquiring sit-up, IAC launched iBuy, a competing falling-price auction channel.

57.     Upon information and belief, IAC launched iBuy in the U.K. as a "trial run" for its eventual launch in the U.S. market. IAC's actions have placed in grave danger sit-up's opportunity to successfully pioneer a falling-price auction channel in the American market, especially given that IAC is based in the United States; it is a global multi-channel retailer; and it owns one of the largest cable television networks in the world and the second largest television retailer, Home Shopping Network, which automatically links iBuy to an impressive roster of U.S. distribution networks.

58.     Indeed, IAC's use of the Trade Secret Material appears already to be causing damage to sit-up in the United States. sit-up recently has been in discussions with American television program distributors regarding sit-up's future launch of a falling-price auction channel in the United States. When sit-up described it's falling-price auction technology to one prominent distributor as unique and innovative, the distributor's representative questioned that description and asked whether he was correct in believing that HSN was already running such a

channel. Thus, the existence of iBuy, albeit in the U.K., is interfering with sit-up's ability to be the first mover in the U.S. market.

59.     Upon information and belief, one or more IAC employees (including John Watson) who spent two years studying the Trade Secret Material, several days and weeks in face-to-face meetings with sit-up asking questions about the Trade Secret Material, and countless hours communicating by email and telephone about the Trade Secret Material, and who came to know sit-up's business (including the "secret sauce" that revealed the sources of price-drop's unprecedented success) nearly as well as sit-up's founders, were the very same employees who developed iBuy and were instrumental in its launch a mere four months after IAC received the last of the Trade Secret Material.

60.     It is thus hardly surprising that iBuy was and is virtually identical to price drop tv in all material respects.

61.     In particular, after having successfully developed home shopping networks in the United States, Japan and Germany based on its fixed-price HSN model, IAC diverged dramatically from its established model by copying sit-up's falling-price auction format (with every winner paying the lowest price), a retail construct that was unique to the industry prior to sit-up's launch of price-drop tv.

62.     With two product presentation set areas, a central area, and a large-screen behind the presenter to enhance product shots, the studio in which the iBuy auction takes place is virtually identical to price-drop tv's studio.

63.     In addition, IAC even copied sit-up's presentation format by hiring several former price-drop tv presenters as presenters for iBuy. These presenters are known to the marketplace as expert in the "falling-price" format, and some even have loyal viewer following. In addition

18

to hiring these key former employees, IAC even adopted the identical presentation format for the live auctions offered by price-drop tv where, among other things, the presenter is joined by another presenter to preview the next product, and uses several catch phrases coined by price-drop tv, including "price plunge," "everyone pays the lowest price," "falling-price auctions," and "no quibble" money back guarantee.

64.    Even the graphics are virtually identical, including the use of a product strap at the bottom of the screen, the location of price information, the prominent use of arrows as part of the auction, the "pulsing" effect for key graphical elements, and the scrolling of winners' names and home towns across the bottom of the screen.

65.    Finally, iBuy's charges for shipping, its telephone charges, its delivery promises, and its return policies match precisely those of price-drop tv's current or former practices.

66.    But without IAC's use and exploitation of the Trade Secret Material that was the culmination of years of trial and error and huge expenditures of intellectual capital by sit-up's founders, the launch of iBuy in April 2005 would have been impossible.

67.    Likewise, it would have been impossible for IAC to have *maintained* a profitable falling-price auction channel without its use of the Trade Secret Material.

68.    IAC's exploitation of the Trade Secret Material has caused considerable damage to sit-up in the United Kingdom, and will cause irreparable damage to sit-up in the United States if sit-up were to lose the advantage of being the pioneer in its field and the leader in the falling-price auction market.

## FIRST CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

69.     sit-up repeats and realleges each and every allegation contained in paragraphs 1 through 68 of this Complaint as if fully set forth herein.

70.     sit-up owns valuable trade secrets, including the Trade Secret Material.  Those trade secrets represent special knowledge and information that is vital to sit-up's business operation including, but not limited to:

     a.  oral presentations and tutorials regarding sit-up's Producer Process and Procedure Manual, a 140-page, highly confidential, step-by-step guide detailing (i) how the falling-price auction is to be operated; (ii) how the producer and presenters should handle certain on-air contingencies; (iii) what on-air terminology should be used during the auction; (iv) the nature of the presenter-producer relationship; and (v) the various camera angles for specific auction events, and providing sample profit logs, sample retail and scheduling logs, and procedures for accessing confidential schedules;

     b.  sit-up's business models, their underlying assumptions, and their core drivers;

     c.  graphical representation producer tools detailing the "perfect" falling-price auction and taking into account such factors as the length of the auction, the start price, the average closing time, the average customer discount, and the target profit;

     d.  five-year business plans, including profit and loss forecasts, revenue analyses, anticipated revenue drivers, anticipated revenue per home figures, growth drivers, forecasted airtime and postage and packing revenue, margin analyses, sales mix

analyses, overhead forecasts (including call center, warehouse and marketing overhead costs), and anticipated distributor commissions;

    e.   planning tools, including weekly sales stock and intake reports, range plans, and task lists, which, together, are the best expression of sit-up's 12-month purchasing expectations and needs;

    f.   product performance reports;

    g.   pricing and inventory measurement tools, including daily schedules detailing, by hour of auction time, the products expected to be sold, sit-up's cost per product, the target sales price, the minimum sales price, the quantity of products for sale, sit-up's anticipated profit in pounds, and the margin percentage;

    h.   schedules detailing sit-up's historical product and price mix, including, among other things, information concerning product attributes, average selling price, total product sales, product mix percentages, total profits, and profits per unit;

    i.   documents reflecting the impact of telephony and "postage and packing" profits on the unprecedented success of price-drop tv; and

    j.   the terms of sit-up's distribution agreements with third parties.

    71.    The Trade Secret Material is not generally known by or available to the public, and sit-up derives economic value from the Trade Secret Material not being generally known to or readily ascertainable by proper means by third-parties who can obtain economic benefit from its use.

    72.    sit-up has attempted to limit the use of the Trade Secret Material by entering into the Non-Disclosure Agreement with IAC, pursuant to which IAC is permitted to use Evaluation

Material, as that term defined in the NDA (and which includes the Trade Secret Material),
"solely for the purpose of evaluating a possible Transaction."

73. Nevertheless, upon information and belief, IAC has knowingly and willfully
misappropriated, and is exploiting for its own economic advantage, the Trade Secret Material.

74. Upon information and belief, IAC has used the Trade Secret Material to develop a
competing falling-price auction channel, iBuy, in breach of the NDA and, upon information and
belief, intends to launch a falling-price auction channel in the United States.

75. IAC's conduct threatens to impede sit-up from pioneering "falling-price auctions"
in the American television market. The harm to sit-up in that event would be irreparable because
being the first competitor in an emerging market niche is a business advantage of immeasurable
value. Absent the first-mover advantage, sit-up will lose the opportunity to, among other things,
tap into a new, growing customer base (and revenue source) with minimal or no cannibalization
from other auction channels. Moreover, sit-up's ability to negotiate meaningfully with U.S.
distributors (for the launch of price-drop tv in the U.S.) and investors and banks (for financing
the launch) will be destroyed if IAC, with its considerably greater resources, its enormous U.S.
distribution potential, its developed U.S. infrastructure, and its massive buying power in the
United States, and with the cross-promotional advantages of owning HSN, is planning to launch
a competing falling-price auction channel in the United States.

76. sit-up is thus entitled to preliminary and permanent injunctive relief to prevent
IAC's launch of a falling-price auction channel in New York.

77. Finally, sit-up is entitled to compensatory and punitive damages in an amount
exceeding $75,000 to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

78.     sit-up repeats and realleges each and every allegation contained in paragraphs 1

through 77 of this Complaint as if fully set forth herein.

79.     On or about August 22, 2003, sit-up and IAC entered into the Non-Disclosure

Agreement.

80.     The Non-Disclosure Agreement is a valid, binding and enforceable contract

governed by New York law.

81.     The Non-Disclosure Agreement provides, in pertinent part, as follows:

In order to pursue the mutual business purpose of a possible transaction between
IAC and the Company [sit-up] and/or their affiliates (the "Transaction"), both
IAC and the Company recognize that there is a need to disclose to one another
certain information in respect of itself and its affiliates. All such information,
delivered by or on behalf of one party and its affiliates (the "Disclosing Party") to
the other party (the "Receiving Party") or its Representatives (as defined below),
whether furnished before or after the date of this Agreement and regardless of the
manner in which it is furnished, together with all analyses, compilations, studies
or other documents or records prepared by the Receiving Party and its
Representatives to the extent such analyses, compilations, studies, documents or
records contain, otherwise reflect, or are generated from such information, is
referred to herein as "Evaluation Material." In consideration of the opportunity to
consider such Evaluation Material, both parties agree as follows:

1.     The Evaluation Material will be used by the Receiving Party and its
affiliates, directors, officers, employees, advisors, agents, controlling persons, and
financing sources or other representatives (collectively referred to as the
"Representatives") solely for the purpose of evaluating a possible Transaction.
Such Evaluation Material will be kept strictly confidential by the Receiving Party
and its Representatives . . . .

82.     The Non-Disclosure Agreement further provides that "both parties agree that

money damages may not be a sufficient remedy for any breach of this Agreement by the

Receiving Party or its Representatives, and that in addition to all other remedies the Disclosing

23

Party may be entitled to specific performance and injunctive relief or other equitable relief as a remedy for any such breach."

83.    The Trade Secret Material was furnished by sit-up to IAC during the term of the Non-Disclosure Agreement, and constitutes Evaluation Material.

84.    IAC breached the Non-Disclosure Agreement by, upon information and belief, using the Trade Secret Material for a purpose other than evaluating a possible transaction with sit-up. In particular, IAC used Trade Secret Material to launch a competing falling-price auction channel in the United Kingdom.

85.    sit-up has fully performed its obligations under the Non-Disclosure Agreement.

86.    IAC's conduct threatens to impede sit-up from pioneering "falling-price auctions" in the American television market. The harm to sit-up in that event would be irreparable because being the first competitor in an emerging market niche is a business advantage of immeasurable value. Absent the first-mover advantage, sit-up will lose the opportunity to, among other things, tap into a new, growing customer base (and revenue source) with minimal or no cannibalization from other auction channels. Moreover, sit-up's ability to negotiate meaningfully with U.S. distributors (for the launch of price-drop tv in the U.S.) and investors and banks (for financing the launch) will be destroyed if IAC, with its considerably greater resources, its enormous U.S. distribution potential, its developed U.S. infrastructure, and its massive buying power in the United States, and with the cross-promotional advantages of owning HSN, is planning to launch a competing falling-price auction channel in the United States.

87.    sit-up is thus entitled to preliminary and permanent injunctive relief to prevent IAC's launch of a falling-price auction channel in New York.

88.    In addition, by virtue of IAC's breach of the Non-Disclosure Agreement, sit-up has been damaged in an amount exceeding $75,000 to be determined at trial.

### THIRD CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

89.    sit-up repeats and realleges each and every allegation contained in paragraphs 1 through 88 of this Complaint as if fully set forth herein.

90.    On or about August 22, 2003, sit-up and IAC entered into the Non-Disclosure Agreement.

91.    Implicit in the Non-Disclosure Agreement is a covenant of good faith and fair dealing in the course of contract performance.  This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

92.    Upon information and belief, IAC exercised bad faith in its performance of the Non-Disclosure Agreement by, *inter alia*, requesting and receiving Trade Secret Material while at the same time giving sit-up the false impression that IAC was using Trade Secret Material solely for the purpose of evaluating a transaction with sit-up, and using Trade Secret Material to develop a competing falling-price auction channel.

93.    IAC's conduct had the effect of thwarting sit-up's rights under the Non-Disclosure Agreement and depriving sit-up of the intended benefit of that Agreement – namely, the ability to meaningfully negotiate with IAC while avoiding the risk that IAC would use Trade Secret Material to develop a competing falling-price auction channel.

94.    sit-up has fully performed its obligations under the Non-Disclosure Agreement.

95.    IAC's breach of the implied covenant of good faith and fair dealing threatens to impede sit-up from pioneering "falling-price auctions" in the American television market.  The

25

harm to sit-up in that event would be irreparable because being the first competitor in an emerging market niche is a business advantage of immeasurable value. Absent the first-mover advantage, sit-up will lose the opportunity to, among other things, tap into a new, growing customer base (and revenue source) with minimal or no cannibalization from other auction channels. Moreover, sit-up's ability to negotiate meaningfully with U.S. distributors (for the launch of price-drop tv in the U.S.) and investors and banks (for financing the launch) will be destroyed if IAC, with its considerably greater resources, its enormous U.S. distribution potential, its developed U.S. infrastructure, and its massive buying power in the United States, and with the cross-promotional advantages of owning HSN, is planning to launch a competing falling-price auction channel in the United States.

96.     sit-up is thus entitled to preliminary and permanent injunctive relief to prevent IAC's launch of a falling-price auction channel in New York.

97.     In addition, by virtue of sit-up's breach of the covenant of good faith and fair dealing, sit-up has been damaged in an amount exceeding $75,000 to be determined at trial.

### FOURTH CAUSE OF ACTION
### (Unfair Competition)

98.     sit-up repeats and realleges each and every allegation contained in paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.     Upon information and belief, (i) IAC misappropriated the results of sit-up's labor, skill, and intellectual capital – namely, the Trade Secret Material that took several years to develop and that is reflected in the creative expression of price-drop tv; (ii) IAC has acted in bad faith by requesting and receiving Trade Secret Material while at the same time giving sit-up the false impression that IAC was using Trade Secret Material solely for the purpose of evaluating a transaction with sit-up; (iii) IAC used Trade Secret Material to develop a competing falling-price

auction channel; and (iv) IAC orchestrated its use of Trade Secret Material in a way that it knew or should have known would inflict significant competitive injury upon sit-up.

100.     In so doing, IAC has avoided the investment of time, money and resources that sit-up has expended to develop the Trade Secret Material, and has engaged and is continuing to engage in unfair competition against sit-up.

101.     Upon information and belief, IAC will continue to engage in unfair competition against sit-up with the launch of a falling-price auction in the United States.

102.     Indeed, IAC's unfair competition threatens to impede sit-up from pioneering "falling-price auctions" in the American television market.  The harm to sit-up in that event would be irreparable because being the first competitor in an emerging market niche is a business advantage of immeasurable value.  Absent the first-mover advantage, sit-up will lose the opportunity to, among other things, tap into a new, growing customer base (and revenue source) with minimal or no cannibalization from other auction channels.  Moreover, sit-up's ability to negotiate meaningfully with U.S. distributors (for the launch of price-drop tv in the U.S.) and investors and banks (for financing the launch) will be destroyed if IAC, with its considerably greater resources, its enormous U.S. distribution potential, its developed U.S. infrastructure, and its massive buying power in the United States, and with the cross-promotional advantages of owning HSN, is planning to launch a competing falling-price auction channel in the United States.

103.     sit-up is thus entitled to preliminary and permanent injunctive relief to prevent IAC's launch of a falling-price auction channel in New York.

104.     In addition, by virtue of IAC's unfair competition, sit-up is entitled to compensatory and punitive damages in an amount exceeding $75,000 to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Misappropriation of an Idea)

105.    sit-up repeats and realleges each and every allegation contained in paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.    A legal relationship existed between sit-up and IAC in the form of the Non-Disclosure Agreement.

107.    IAC has knowingly and willfully misappropriated, and is exploiting for its own economic advantage, a novel and concrete idea – namely, the unique methods of selling products profitably at an unknown, falling price, and the price modeling and product identification techniques used to determine (i) the rate at which auction prices should fall, the target selling price, and the minimum selling price, (ii) the magnitude of the price drop, and (iii) the type and quantity of products to be sold.

108.    Upon information and belief, IAC has used these ideas to develop a competing falling-price auction channel.

109.    IAC's conduct threatens to impede sit-up from pioneering "falling-price auctions" in the American television market.  The harm to sit-up in that event would be irreparable because being the first competitor in an emerging market niche is a business advantage of immeasurable value.  Absent the first-mover advantage, sit-up will lose the opportunity to, among other things, tap into a new, growing customer base (and revenue source) with minimal or no cannibalization from other auction channels.  Moreover, sit-up's ability to negotiate meaningfully with U.S. distributors (for the launch of price-drop tv in the U.S.) and investors and banks (for financing the launch) will be destroyed if IAC, with considerably greater resources, a developed U.S. infrastructure, and massive buying power in the United States, and with the cross-promotional

advantages of owning HSN, is planning to launch a competing falling-price auction channel in the United States.

110.    sit-up is thus entitled to preliminary and permanent injunctive relief to prevent IAC's launch of a falling-price auction channel in New York.

111.    Finally, sit-up is entitled to compensatory and punitive damages in an amont exceeding $75,000 to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, sit-up demands judgment against IAC as follows:

A.       Preliminary and permanently enjoining IAC and its officers, directors, agents, employees, servants, attorneys, successors, assigns and all others controlling, controlled by or affiliated with IAC, and all those in privity or active concert or participation with any of the foregoing, from:

(i)       directly or indirectly misappropriating or attempting to misappropriate the Trade Secret Material in any fashion whatsoever;

(ii)      launching, airing, distributing, or licensing, or contracting with any third party for the launch, airing, distribution or licensing of, a rising-price or falling-price auction channel in New York;

(iii)     disclosing to any third party any Trade Secret Material; and

(iv)     using any Trade Secret Material in any fashion whatsoever.

B.       Preliminary and permanently enjoining IAC and its officers, directors, agents, employees, servants, attorneys, successors, assigns and all others controlling, controlled by or affiliated with IAC, and all those in privity or active concert or participation with any of the foregoing, from:

(i)       launching, airing, distributing, or licensing, or contracting with any third party for the launch, airing, distribution or licensing of, a falling price auction channel in New York, unless IAC certifies in writing to the Court that it has adopted "clean room" procedures to prevent the use and disclosure of Evaluation Material;

(ii)      disclosing to any third party any Evaluation Material; and

(iii)     using any Evaluation Material in any fashion whatsoever.

C.      Requiring IAC to establish appropriate "clean room" procedures to ensure that any falling-price auction network developed by IAC in New York for launch anywhere in the United States is not based on the Trade Secret Material and/or Evaluation Material.

D.      Directing IAC, within 30 days of the entry of judgment, to

(i)      provide to sit-up a full accounting of any Trade Secret Material and/or Evaluation Material in its possession, custody, or control;

(ii)      provide to sit-up a full accounting of any Trade Secret Material and/or Evaluation Material provided to third parties, including by identifying all third parties to whom any Trade Secret Material and/or Evaluation Material was disclosed;

(iii)      return to sit-up any Trade Secret Material and/or Evaluation Material; and

(iv)      use best efforts to obtain the return of any Trade Secret Material and/or Evaluation Material from the parties required to be identified by IAC pursuant to (ii) above.

E.      Requiring IAC to provide sit-up with forensic images of any Trade Secret Material and/or Evaluation Material stored for any period of time on any computer hard drives, computer disks, computer tapes or other electronic storage media that are in its possession, custody or control.

F.      Awarding compensatory and punitive damages in an amount exceeding $75,000 to be determined at trial;

G.      Awarding sit-up's costs, disbursements and reasonable attorneys' fees in connection with this action; and

H.    Awarding such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       November 1, 2005

MAYER, BROWN, ROWE & MAW LLP

By: _____
     Dennis P. Orr (DO 6488)
     A. John P. Mancini (AJPM 5829)
     Stefan W. Engelhardt (SE 0055)

     1675 Broadway
     New York, New York 10019
     (212) 506-2500
     Attorneys for plaintiff sit-up Limited

32