UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                       :

SIT-UP LIMITED,                    :

                     Plaintiff,    :

                                         :      05 Civ. 9292 (DLC)

             -v-                    :

                                         :      OPINION & ORDER

IAC/INTERACTIVECORP. and HSN     :
INTERNATIONAL,                 :

                   Defendants.    :

                                         :
----------------------------------------X

Appearances:

For Plaintiff:
Richard Ben-Veniste
A. John P. Mancini
Matthew D. Ingber
Gregory A. Frantz
Mayer Brown LLP
1675 Broadway
New York, New York 10019

For Defendants:
Randy M. Mastro
Orin Snyder
Marshall R. King
Alma Asay
Gibson, Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, New York 10166

DENISE COTE, District Judge:

     This case arises out of the failed efforts of defendants

IAC/InterActive Corp. ("IAC") and HSN International ("HSN") to

acquire plaintiff sit-up Limited ("sit-up") in order to enter

the lucrative British television home shopping market.

Defendants undertook due diligence and investigated sit-up's

business, and subsequently made purchase bids that sit-up
rejected.  Rebuffed, defendants then acquired another British
television home shopping network, entered the market, failed,
and closed up shop.  In the instant action, sit-up alleges that
IAC and HSN used trade secrets revealed during their due
diligence in launching their home shopping network, and brings
claims for breach of the companies' non-disclosure agreement as
well as an array of alleged tortious activity.  Defendants move
for summary judgment on all claims, and sit-up moves for partial
summary judgment on its claim for breach of contract.  For the
following reasons, both motions are granted in part.

BACKGROUND

The facts that follow are undisputed unless otherwise
noted.  sit-up is a British television retailing business
founded in 1999.  IAC is the parent company of HSN, which
founded home shopping television in 1981 and has since been one
of the most recognized companies in the industry.  Today, HSN is
the second largest television retailer in the world.

sit-up launched an interactive screen commerce channel
called bid-up.tv ("bid-up") in November 2000.  At the time of
its launch, bid-up conducted primarily rising-price auctions --
that is, auctions in which each successive bid raises the price
of the item for sale.  By October 2000, however, sit-up had
begun experimenting with falling-price auctions, in which the

price drops until the available stock is exhausted and each purchaser pays the last and lowest price. In June 2003, sit-up launched price-drop.tv ("price-drop"), an interactive screen commerce channel dedicated primarily to falling-price auctions. price-drop was extremely successful, generating more than $200 million in sales in its first year of operation.

I.    Talks Begin Between sit-up and Defendants

The United Kingdom is one of the top markets worldwide for home shopping television, and has historically been dominated by HSN's primary competitor, QVC. Before 2003, HSN had made efforts to gain a foothold in the British television retailing market, but those efforts had been unsuccessful. In June 2003, a sit-up shareholder approached HSN and suggested that it might be interested in sit-up's business. On July 1, John Watson, chief executive officer of HSN International and chief operating officer of HSN, wrote an email to the leadership of IAC informing them that he had met with sit-up executives "to go through their channel concepts and to get a sense of their progress." He stated that he "was impressed with the business models (auction tv/dutch auction tv) and their progress (they claim to be 100M pounds this year and marginally profitable)." He expressed a "belie[f] that we should dive deeper into another rev[ie]w of this company." Barry Diller, chairman and chief executive of IAC, replied to Watson's email and stated, "I've

always been intrigued with this . . . [L]et's aggressively see
if it makes sense for us to pursue."

Acquisition discussions began in July, and on August 22,
the parties signed a nondisclosure agreement ("NDA").  Under the
NDA, sit-up agreed to furnish HSN with "Evaluation Material,"
defined as:

> All . . . information . . . whether furnished before
> or after the date of [the NDA] and regardless of the
> manner in which it is furnished, together with all
> analyses, compilations, studies or other documents or
> records prepared by [IAC] and its Representatives to
> the extent such analyses, compilations, studies,
> documents or records contain, otherwise reflect, or
> are generated from such information.

The NDA made clear, however, that "Evaluation Material" did not
include information which:

> (i) is or becomes <u>generally available to the public</u>
> other than as a result of the breach of this Agreement
> by the Receiving Party or its Representatives, (ii) is
> or has been <u>independently acquired or developed by the</u>
> <u>Receiving Party</u> and its Representatives without
> violating any of the receiving party's obligations
> under this Agreement, (iii) was <u>within the Receiving</u>
> <u>Party or its Representatives' possession prior to it</u>
> <u>being furnished</u> to the Receiving Party or its
> Representatives by or on behalf of the Disclosing
> Party pursuant to the terms hereof, or (iv) is
> <u>received from a source other than the Disclosing Party</u>
> <u>or any of its Representatives</u>; provided that, in the
> case of (iii) and (iv) above, the source of such
> information was not known by the Receiving Party to be
> bound by a confidentiality obligation to the
> Disclosing Party or any other party with respect to
> such information.

(Emphasis supplied).  Under the terms of the NDA, all
"Evaluation Material" was to be used by HSN and IAC "solely for

the purpose of evaluating a possible [t]ransaction" with sit-up,
and was to be destroyed or returned to the providing party
within five days of the providing party's request.  The NDA was
effective for one year, commencing September 1.  By letter
agreement executed July 8, 2004, the parties agreed to extend
the NDA until September 1, 2005.  The NDA did not include a
provision prohibiting IAC either from competing with sit-up in
the British marketplace or from developing a channel that would
conduct falling-price auctions.

II.  Defendants' Due Diligence and Acquisition Offers

       Between September 2003 and July 2004, sit-up and HSN
representatives met both in London and in the United States to
discuss possible collaboration and/or acquisition.  HSN's due
diligence team included, among others, John Watson; Terry
Curtis, senior vice president of HSN International; Andrea
Kirschner, HSN's senior manager of international finance; Moshe
Koyfman, a member of IAC's mergers and acquisitions group; and
Michael Pekowsky, HSN's vice president and senior international
counsel.  The team informed sit-up that IAC was interested in
entering the British marketplace regardless of whether the
parties ultimately agreed on an acquisition deal.

       The scope and breadth of HSN's due diligence of sit-up are
the subject of vigorous dispute between the parties.  It is
undisputed, however, that sit-up provided HSN with an array of

documents concerning, among other things, sit-up's historical financial data, projected income, consumer research, and buying processes, as well as access to sit-up's facilities.  It is also undisputed that, during the course of HSN's due diligence, its team solicited additional information from sit-up through particularized requests concerning the latter company's finances and business models.  For example, in November 2003, Kirschner wrote to sit-up principals Ashley Faull, John Egan, and Chris Manson, asking them to "fill out the yellow highlighted cells" in an attached spreadsheet plotting sit-up's financial data. The same day, Koyfman emailed sit-up and requested a distribution summary prepared by sit-up's lawyers as well as an electronic capitalization table previously provided in hard copy by sit-up.  In response, Faull sent Koyfman a six-page memorandum summarizing sit-up's carriage agreements.

During the course of HSN's due diligence in late 2003, members of the team expressed enthusiasm internally about both sit-up and the prospect of reentering the British marketplace after the company's earlier, failed efforts to do so.  Tom McInerney, chief executive officer of IAC retailing and chief financial officer of IAC, told Diller that sit-up's story was "a pretty impressive one."  Watson, writing to IAC leadership, observed that reentering the British marketplace –- either by converting a preexisting IAC-owned channel to a shopping format

or by acquiring sit-up –- "would be a once in a lifetime chance to put HSN right next to QVC and with HSN relaunched (this time) intelligently, I believe it would have a very strong probability of success."

Due diligence continued into 2004, and HSN's enthusiasm for sit-up grew with time. In March 2004, McInerney recognized that "every indication is that our initial instinct that this is working and would have real near term earnings momentum appears in-tact [sic] . . . ." IAC made an offer to purchase sit-up in March for sixty million British pounds upfront and maximum consideration of 150 million British pounds, assuming sit-up met all of its stated financial targets for 2004 and 2005. sit-up refused the offer and did not make a counter-proposal. In May 2004, following additional due diligence, Diller wrote an email to McInerney asking, "IS SIT/UP A COPYRIGHTED IDEA . . . CAN IT BE IN THE GREAT HISTORICAL PRACTICES OF ALL TELEVISION . . . BORROWED?" (All caps in original.) In June 2004, IAC submitted a non-binding proposal to acquire sit-up, offering upfront consideration of 100 million British pounds, in addition to contingent consideration based upon 2005 revenue milestones. sit-up rejected the offer as too low.

Around the same time that sit-up rejected IAC's second offer, it began entertaining an offer from HSN's main competitor, QVC. Admittedly disheartened by the rebuff from

sit-up, IAC began to make alternative plans.  On July 1, Diller
wrote an email to McInerney in which he "assume[d] we would then
proceed with our own plans to compete with Sit-Up in the US . .
. ."  But on July 5, HSN's John Watson, who reported directly to
McInerney, sent an email to McInerney confirming plans to visit
sit-up's headquarters and undertake further due diligence.  The
circumstances giving rise to these renewed relations between HSN
and sit-up are disputed, but there is no dispute that for
several days, members of the HSN team undertook additional
"active diligence on sit-up."  The team reviewed sit-up
documents, including a twenty-eight-page PowerPoint presentation
labeled "Strictly Confidential," which included sit-up's summary
financial projections through 2008 for total revenue, annual
growth, gross profit, EBITDA (earnings before interest, taxes,
depreciation, and amortization), profit, operating cashflow, and
net assets, and was granted access to sit-up's headquarters and
facilities.

On July 23, IAC informed sit-up that it would not submit a
revised offer to purchase the company.  Indeed, IAC never made a
subsequent offer for sit-up.

III. AuctionWorld and iBuy

Following its decision not to make a revised offer for sit-
up, IAC approached AuctionWorld, another British television
auction channel, regarding a potential acquisition.

AuctionWorld had aired both rising-price and random-price auction channels, but never a falling-price auction channel. Such a channel was in the works, however, when IAC approached AuctionWorld in July 2004.  Indeed, by November 2004, AuctionWorld had developed the technological elements necessary to run a falling-price auction channel, as well as financial forecasts and assumptions for that channel, to be called "drop-it."

     At the time of IAC's overtures, AuctionWorld was beset with serious financial troubles.  IAC therefore believed "that there was potential for a reduced price entry into the UK market with a small, manageable investment that would save time and provide for an excellent upside in the potential to grow the business." Following submission of a non-binding letter of intent to purchase AuctionWorld, IAC undertook due diligence of the company.  During that process, IAC became concerned about AuctionWorld's financial state and problems with British regulatory authorities, and eventually ended acquisition discussions.  The chief operating officer of AuctionWorld resigned in November 2004, and on or about November 18, AuctionWorld ceased trading and broadcasting.  Thereafter, several members of AuctionWorld's management team pleaded guilty to criminal charges stemming from fraud committed at AuctionWorld.

Those members of the AuctionWorld management team who were left behind in the wake of these resignations and criminal charges began work on a business proposal for a new interactive television channel. The proposal attracted the attention of numerous potential investors, including IAC. In December 2004 and January 2005, IAC hired eight former AuctionWorld employees as consultants to assist IAC in developing AuctionWorld's business proposal, with an eye towards IAC's eventual acquisition of AuctionWorld's assets. On the IAC side, several of the employees working on the AuctionWorld project had been involved in sit-up due diligence and acquisition talks. These included, among others, John Watson, Terry Curtis, Andrea Kirschner, and Michael Pekowsky.

On January 25, 2005, IAC paid eighty thousand British pounds to acquire certain of AuctionWorld's assets. Over the next three months, IAC prepared for the launch of its new channel, based at least in part on its acquisitions from AuctionWorld, which was to be called "iBuy." Although the AuctionWorld team had originally planned to launch a multi-format channel, IAC decided to run iBuy exclusively as a falling-price channel. iBuy launched in April 2005 for a three-month test period on two of the four digital platforms in the

United Kingdom, giving it access to 9.3 million households.[1]
Following the three-month test period, IAC and HSN executives --
most prominently Tom McInerney -- reviewed iBuy's performance
and, in July 2005, approved its continued operation.

iBuy lost money every month it was in business.  In
addition, after the merger of two British television platforms
in March 2006, iBuy's distribution agreement with one of the
merging platforms was terminated,[2] relegating iBuy to only one
British platform and limiting its access to British households.
iBuy closed its operations and ceased broadcasting in March
2007.

IV.  Procedural History

sit-up filed the complaint in the instant lawsuit on
November 2, 2005, approximately six months after iBuy's launch.
The complaint brought causes of action for misappropriation of
trade secrets, breach of contract, breach of the implied
covenant of good faith and fair dealing, unfair competition, and
misappropriation of an idea, and sought, <u>inter alia</u>, preliminary

---

[1]    At the time, price-drop, by contrast, had access to sixteen
million households.

[2]    The parties do not dispute that sit-up founder Ashley Faull
recommended to the two merging platforms that it no longer carry
iBuy after the merger was completed.

and permanent injunctions.[3]  The gravamen of sit-up's complaint

is that IAC and HSN gained access to sit-up's trade secrets

during their due diligence, and then used those secrets, in

violation of the NDA, to launch iBuy.  IAC and HSN deny using

any of sit-up's trade secrets, and contend that they developed

iBuy independently, through a combination of publicly available

information concerning falling-price auctions and the assets and

knowledge they acquired through their purchase of AuctionWorld.

Following massive document discovery, a conference was held

on August 29, 2006 to address certain discovery disputes.

Defendants claimed that plaintiff had failed to produce numerous

critical documents despite representing to defendants that

production was complete or substantially complete.  Plaintiff

was ordered to produce any additional requested documents and to

submit two affidavits of compliance.  Following that conference,

the parties continued to meet and confer to address discovery

disputes, keeping the Court apprised both of the parties'

progress in discovery and their need for additional time to

complete summary judgment motions.

A conference was held on December 15, 2006 to address what

appeared to be a sprawling discovery process beset by numerous

conflicts.  The meet and confer process had broken down and, by

---

[3]     Plaintiff withdrew its motion for a preliminary injunction
at a November 11, 2005 conference.

the date of the conference, defendants had yet to receive the two affirmations of compliance required by the Court at the August 29 conference. Defendants complained of plaintiff's discovery abuse, including the belated disclosure of some fifty-one witnesses and the failure to search a variety of email and other electronic databases for requested information. The parties were required to meet and confer again to discuss the various disputes, and a subsequent conference was scheduled for December 21.

By letter dated December 21, counsel for the defendants informed the Court that the parties had reached agreement with respect to most of the discovery disputes and proposed a schedule going forward. The letter also identified a single, unresolved issue to be addressed at that day's conference, to wit, the alleged lack of specificity of plaintiff's trade secret allegations. According to defendants, their Interrogatory 16, propounded July 19, 2006, asked plaintiff to identify by Bates number all information or documents constituting, reflecting, embodying, or containing material that plaintiff alleged comprised its trade secrets. Plaintiff replied that its trade secrets were strewn across at least 13,000 pages produced in discovery. Addressing this issue at the December 21 conference, the Court stated:

> The plaintiffs are going to have to open to a jury.
> They're going to have to sum up. They're going to
> have to potentially resist a summary judgment motion.
> They have to be able to identify with specificity what
> information they consider to have been a trade secret
> and to identify the route through which it was
> provided to the defendants and then to otherwise show
> the misappropriation. If the plaintiff can't do that
> now, it can't proceed on that theory, because the
> defendants have a right during discovery to test
> whatever the plaintiff's theory is, and we're not
> going to . . . reopen discovery after summary judgment
> briefing or in the middle of a trial.

The Court remonstrated plaintiff that it would be required to

"narrowly define with specificity your trade secrets." Indeed,

at the conference, the Court repeatedly reminded plaintiff of

its burden at trial or in defending against a motion for summary

judgment on a trade secret misappropriation claim, and its

obligation to disclose its alleged trade secrets in detail to

defendants so that defendants could prepare for the depositions

of those witnesses who would be testifying about trade secrets.

Plaintiff was ordered to produce by January 31, 2007,

> a detailed specific list of each trade secret and an
> identification of the document in which it was
> contained and the methodology through which it was
> communicated to the defendants, either given to them,
> e-mailed to them, shown to them by X witness or . . .
> –– I don't pretend to make an exclusive list here ––
> or contained in a room to which they had access
> without a witness saying that they actually looked at
> it.

A subsequent conference was scheduled for February 14.

On January 31, plaintiff provided defendants with a lengthy

response to their request for specific details concerning

plaintiff's alleged trade secrets.  By letter dated February 13,
defendants argued that plaintiff's submission failed to comply
with the Court's December 21 directive concerning presentation
of the alleged trade secrets because the submission "brings us
no closer than before to knowing what specific 'trade secrets'
Plaintiff believes it has or what about them Plaintiff believes
is 'secret.'"[4]  Indeed, the January 31 submission did not contain
any real description of the alleged trade secrets.  Rather, it
outlined general categories into which the alleged trade secrets
fell, and attached schedules of documents corresponding to those
categories, identified by their Bates numbers and the means by
which the documents were allegedly communicated to defendants.

At the February 14 conference, the Court ruled that
plaintiff would be bound by its January 31 submission, subject
to any amendment made shortly after the conference.  The Court
stated that plaintiff's "case will rise or fall, to the extent
that [it] rests on a trade secret theory, on [its] ability to
identify those trade secrets and respond to the other
information described in this amended response."  The Court
further elaborated:

> If the plaintiff is bound to this answer, I expect
> [defendants will] be arguing to me at summary judgment
> that they have not been able to identify, with

---

[4]    In their letter, defendants requested dismissal of the
action pursuant to Federal Rule of Procedure 37.  This request
was not pursued further following the February 14 conference.

> sufficient specificity, something that could be given
> trade secret protection and, therefore . . . they're
> not going to be able to respond to that in opposing
> your summary judgment motion by giving you that
> specificity for the first time.  They were given this
> chance.  They're going to be bound by this response.

Finally, the Court again reminded plaintiff of its eventual

burden at trial or in opposing summary judgment:

> Plaintiff is asserting trade secret violations.
> Plaintiff is the only one who can know what it
> believes its trade secrets are.  No one else can do
> this work for you.  If you can't do this work -- we've
> been down this road before -- you can't open to a
> jury, much less sum up to a jury, nor can you defend a
> summary judgment motion.  And it is unfair to your
> clients and to the defendants to conduct discovery
> without knowing what the assertions are.

Plaintiff was given an additional week, until February 21, to

provide defendants with "narrative identifier[s] of your trade

secrets, with sufficient specificity so that we would know what

they are," and was again warned that "[a]nything that you

identify in the next week and is still of a level of generality

that it cannot qualify as a trade secret will obviously fail as

a matter of law."  On February 21, plaintiff submitted a twenty-

eight-page narrative alleging the existence of more than one

hundred separate trade secrets.

Following the February 21 submission, additional extensions

were granted pursuant to the parties' requests.  Plaintiff's

motion for partial summary judgment and defendants' motion for

summary judgment were served on October 3, and fully submitted
on November 16.[5]

DISCUSSION

Summary judgment may not be granted unless all of the
submissions taken together "show that there is no genuine issue
as to any material fact and that the moving party is entitled to
a judgment as a matter of law." Fed. R. Civ. P. 56(c). The
moving party bears the burden of demonstrating the absence of a
material factual question, and in making this determination, the
court must view all facts in the light most favorable to the
non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d
Cir. 2006). When the moving party has asserted facts showing
that the non-movant's claims cannot be sustained, the opposing
party must "set forth specific facts showing that there is a
genuine issue for trial," and cannot rest on the "mere

---

[5]    Following submission of the motions for summary judgment,
the parties engaged in extensive collateral litigation over the
scope of documents and pleadings to be filed under seal.  That
dispute turned largely on plaintiff's inability to identify with
specificity the precise words, terms, figures, or documents
requiring sealing.  Following much correspondence between the
parties and three conferences with the Court held on October 18
and October 23, 2007, and January 17, 2008, the parties were
permitted to file under seal a limited universe of documents
containing certain financial data and other sensitive
information.  By Order dated January 22, 2008, the parties were
required to file all summary judgment pleadings and supporting
evidence, including any redactions made in compliance with the
Court's orders, by Friday, February 1.

allegations or denials" contained in the pleadings.  Fed. R.
Civ. P. 56(e); <u>accord</u> <u>Sista</u>, 445 F.3d at 169.  That is, the non-
moving party "must do more than simply show that there is some
metaphysical doubt as to the material facts."  <u>Matsushita</u>
<u>Electric Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586
(1986).  Only disputes over material facts -- facts that might
affect the outcome of the suit under the governing law -- will
properly preclude the entry of summary judgment.  <u>Anderson v.</u>
<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

I.   Plaintiff's Trade Secret Misappropriation Claim

sit-up claims that IAC and HSN misappropriated both an
array of individual trade secrets as well as its overarching
business method -- what sit-up labels its "secret sauce" --
which sit-up contends are entitled to trade secret protection.
For a party to succeed on a claim for the misappropriation of
trade secrets under New York law,[6] it must demonstrate: "(1) that
it possessed a trade secret, and (2) that the defendants used
that trade secret in breach of an agreement, confidential

_____

[6]     The NDA provides that the "validity and interpretation of
this Agreement shall be governed by, and construed and enforced
in accordance with, the laws of the State of New York . . . ."
Although it is not clear that all of plaintiff's claims derive
from the NDA, the parties rely on New York law in discussing all
claims predicated on state law.  Accordingly, where state law
governs, New York law will be applied.  <u>See, e.g.</u>, <u>Merrill Lynch</u>
<u>Interfunding, Inc. v. Argenti</u>, 155 F.3d 113, 121 n.5 (2d Cir.
1998).

18

relationship or duty, or as a result of discovery by improper means." N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999). "[A] trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955, 968 (2d Cir. 1997) (citation omitted). A trade secret "is not simply information as to single or ephemeral events in the conduct of the business; rather, it is a process or device for continuous use in the operation of the business." Id. (citation omitted).

A.    The Parties' Submissions

First, a word about the parties' submissions on this claim is warranted. As discussed above, plaintiff's inability to identify its trade secrets with specificity has been an issue in this action for more than half of its pendency. On December 21, 2006, this Court advised plaintiff that "[t]hey have to be able to identify with specificity what information they consider to have been a trade secret and to identify the route through which it was provided to the defendants and then to otherwise show the misappropriation." After sit-up produced a wholly unacceptable submission on January 31, 2007, the Court gave it a final opportunity to limn its trade secrets, and ruled that its

submission, due February 21, 2007, would constitute its binding representation of the full corpus of its alleged trade secrets.[7] That submission identified more than one hundred individual trade secrets in varying degrees of specificity. Some of these secrets are almost comic in their obviousness -- for example, that the auction producer relies on "[a] live shot of the auction, as seen by the viewer." Others are obfuscatory and sometimes unintelligible -- for example, plaintiff claims a trade secret in the fact that "[t]he refund rate in a falling-price model was lower than in a rising price model," despite testimony by sit-up's founder and senior executive that he was unfamiliar with the term "refund rate."

In connection with their motion for summary judgment, defendants submitted an appendix which proceeds methodically through plaintiff's individual trade secret allegations and delineates, with citations to record evidence, defendants' objections to plaintiff's claims for trade secrets. Specifically, defendants claim that each of the alleged trade secrets is vague and ambiguous, not secret, and/or not used. In

_____

[7]   Among other things, that submission included absolutely no reference to the manner in which defendants were alleged to have used or misappropriated any of sit-up's proffered trade secrets, as was required by the Court at the December 21, 2006 conference.  Indeed, it appears that the first notice defendants received concerning sit-up's particularized allegations of their "use" of the individual alleged trade secrets was in sit-up's counter-appendix, which was filed in connection with sit-up's opposition to defendants' motion for summary judgment.

reply, plaintiff submitted its own appendix refuting each of
defendants' challenges to its trade secret claims.  It provides
citations not to record evidence, but rather to paragraphs in
the Rule 56.1 statements (which are often unsupported by
citations to record evidence) and to sections of its brief in
opposition to defendants' motion for summary judgment, which
address only plaintiff's legal arguments, and not any factual
disputes.

Plaintiff continued its Dance of the Seven Veils approach
to the trade secret claim in its brief in opposition to
defendants' motion for summary judgment, persisting in its
resistance to explaining fully the basis for its trade secret
claim.  The parties' discussion of Secret 5.A.2 is emblematic of
sit-up's approach.  Secret 5.A.2 states,

> Sit-up sold the same product in different formats ––
> rising-price and falling-price –– and, on average, the
> falling-price dynamic generated higher product
> contribution per minute for sit-up.  This phenomenon
> existed because of: (1) the perception among customers
> that they are getting a better deal; and (ii) the
> impulse for customers to call in before "missing out"
> on the product.

In their appendix, defendants contend that this information is
not secret because sit-up has "publicly disclosed the fact that
its falling price auctions were very profitable, and that its
falling price auctions were more profitable than its rising
price auctions."  In reply, sit-up claims that the trade secret

it is asserting "is not the mere <u>fact</u> that falling-price auctions are more profitable, but the reasons <u>why</u> this is the case, and the financial and operational underpinnings of this phenomenon." As support for this statement, sit-up cites to eight <u>pages</u> of its February 21 submission, containing nearly fifty individual trade secret allegations. These pages cover issues as disparate as telephony profits, key performance indicators, and product turnover, but shed little light on defendants' argument that Secret 5.A.2 was not, in fact, secret. sit-up's reply, by merely referring back to other, challenged assertions about the secrecy of its business practices, obfuscates yet again the basis for its trade secret claims.

B.   Trade Secret Claim for "Secret Sauce"

sit-up brings a claim for trade secret misappropriation with regard to its "secret sauce" -- its "overarching business method," comprised of the more than one hundred alleged individual trade secrets -- which permits it to run a successful falling-price auction channel. Under New York law, "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." <u>Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc.</u>, 920 F.2d 171, 174 (2d Cir. 1990)

22

(citation omitted).  Here, sit-up has not demonstrated the "way
in which [the] various components fit together as building
blocks in order to form the unique whole," id. (citation
omitted), and thus has not raised a triable issue of fact as to
its "unique combination," id. (citation omitted).  Therefore,
defendants' motion for summary judgment on this claim is
granted.

Defendants argue primarily that summary judgment should be
granted on sit-up's trade secret claim because sit-up has failed
to set forth its alleged trade secrets with specificity.
Defendants' argument is best understood to be a claim that sit-
up has failed to specify the "unified process, design and
operation," id., of its "secret sauce."  In cases where
protection for a plaintiff's overarching business method has
been granted, the plaintiff has been required to adduce evidence
showing that its business methods were unique in their manner of
combining various constituent elements.  For example, in
Integrated Cash Management Services, Inc., the district court
described the following testimony in finding that the
plaintiff's business method as a whole was worthy of trade
secret protection:

> Plaintiffs . . . presented testimony showing that
> although one could purchase commercial products which
> performed the utilities at issue, the ICM generic
> utilities were constructed in a specific manner in
> order that they be especially suited to the task they

> were to perform in a specific context.  In addition,
> [plaintiff's witness] testified that the several
> modules were constructed so as to fit and work
> together in a particular way.

Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc.,

732 F. Supp. 370, 376 (S.D.N.Y.), aff'd, Integrated Cash Mgmt.

Serv., Inc., 920 F.2d 171.  Here, sit-up has offered no such

concrete evidence that its business method uniquely strung

together certain elements in a particular way.  Rather, sit-up

would have the Court infer that, because it ran a successful

falling-price auction business, its combination of various,

possibly secret, data and business protocols must have been

unique.  Raising the specter of trade secret appropriation in

this manner does not substitute, however, for evidence that the

more than one hundred individually identified alleged trade

secrets were somehow combined by sit-up to form a unique whole.

Indeed, sit-up's entire opposition brief discussion of

trade secret protection for its overarching business method is

dedicated to the proposition that it is "entitled to proceed to

trial on its overall business method, which is plainly

protectable as a compilation trade secret under New York law."

Whether something is protectable, and whether it is deserving of

protection, are two entirely different questions.  New York and

Second Circuit law establish that compilation trade secrets are

protectable but, as discussed above, the law requires the trade

secret claimant to describe the secret with sufficient
specificity that its protectability can be assessed and to show
that its compilation is unique.[8]  sit-up has plainly failed to do
this, opting instead for an argument that, should it proceed to
trial, it could adequately describe its "secret sauce" and
demonstrate its uniqueness.  Throughout the entirety of this
litigation, sit-up evaded its obligations to disclose the basis
of its claims.  Its failure on summary judgment to demonstrate
not only that its trade secret is in theory protectable, but
also in fact worthy of protection, is ultimately fatal to this
claim.

---

[8]     Indeed, in all but one of the cases cited by sit-up for the
proposition that compilation trade secrets are protectable,
plaintiffs only won trade secret protection for their business
methods after they demonstrated that these methods were a unique
combination of either publicly available or secret elements.
For example, in Imperial Chem. Indus. v. Nat'l Distillers and
Chem. Corp., 342 F.2d 737 (2d Cir. 1965), the Second Circuit
affirmed the district court's recognition of trade secret
protection for the plaintiff's business process.  The district
court in that case found that although eight of the nine
constituent elements of a particular chemical process were in
the public domain, the "unified description of the design,
process and operation, i.e, the way in which the factors were
interrelated" was a secret and worthy of protection.  Id. at
740.  Here, sit-up has offered no such "unified description."
     In the remaining case, Alnwick v. Eur. Micro Holdings,
Inc., 281 F. Supp. 2d 629, 638 (E.D.N.Y. 2003), the district
court merely ruled, in denying a motion to dismiss, that
plaintiff could plead a trade secret cause of action based on
the method of operating its business.  This proposition is not
in dispute.

C.   Individual Trade Secret Claims

As described above, defendants contend that each of the individual trade secrets alleged by plaintiff fails as a matter of law because it is vague and ambiguous, not secret, and/or not used.  These three challenges shall be treated in turn.

1.   Vague and Ambiguous

Defendants allege that approximately eighty-six of sit-up's proffered trade secrets are vague and ambiguous, and therefore fail as a matter of law.  Defendants use the "vague and ambiguous" designation broadly, encompassing at least six different legal issues.  These include claims that the proffered trade secret (1) is a false description; (2) includes undefined or approximate terms; (3) includes such voluminous material that defendants cannot identify the allegedly secret content; (4) does not distinguish between sit-up's entire business and price-drop, the relevant falling-price auction comparator; (5) fails to specify a time period; and (6) was not in "continuous use in the operation of the business."  Softel, Inc., 118 F.3d at 968 (citation omitted).

sit-up implausibly contends that it need not identify its alleged trade secrets with specificity.  But in doing so, it relies uniformly on cases where plaintiff only sought compilation trade secret protection; that is, protection solely for plaintiff's unique manner of combining certain pieces of

public information into a commercially advantageous business model.  See, e.g., Integrated Cash Mgmt. Servs., Inc., 920 F.2d at 174; Imperial Chem. Indus., 342 F.2d at 740; see also Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 411 (6th Cir. 2006).  In such cases, the court rightly rebuffed the defendants' suggestion that the plaintiff should be required to show that some constituent element of the business method or model was itself a trade secret.  These cases are plainly inapposite, where sit-up contends that each of more than one hundred items is itself a trade secret.  In making such extensive claims, sit-up has a heavy burden to shoulder.

Simply put, that burden includes describing the alleged trade secret with adequate specificity to inform the defendants what it is alleged to have misappropriated.  Every court to have opined on this issue has ruled that specificity is required. See, e.g., IDX Systems Corp. v. Epic Systems Corp., 285 F.3d 581, 583 (7th Cir. 2002); MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 522 (9th Cir. 1993).  Although the Second Circuit has not squarely articulated a specificity requirement, there is no reason to believe that it would permit a party to advance a trade secret claim in vague and ambiguous terms.

Indeed, at least one case from the Second Circuit suggests that specificity is required.  In Heyman v. AR. Winarick, Inc., 325 F.2d 584 (2d Cir. 1963), the circuit considered a

specificity challenge to the disclosure of an alleged trade secret. The plaintiff claimed trade secret protection for a chemical compound similar to the one defendants ultimately used in their cosmetics business. He claimed that he had divulged the secret formula for that compound in negotiations with the defendants, but it was undisputed that he had merely referred to his formula as a "quaternary." On appeal, the Second Circuit affirmed the district court's factual finding that the "plaintiff's casual reference to a quaternary was not the disclosure of a trade secret," because the Second Circuit deemed that disclosure to be "so vague and indefinite as not to be entitled to protection under the law of trade secrets." Id. at 590. A corollary requirement of specificity for claimed trade secrets is inferable from this holding: If a particular piece of information, or a formula, is not entitled to trade secret protection because it is "so vague and indefinite" at the time it is divulged, then it cannot be granted protection as a trade secret by a court during litigation if it is "vague and indefinite." Specificity is required at the moment of divulging so that the party to whom the secret is revealed understands the contours of the secret information and does not inadvertently or purposefully transgress its boundaries. Similarly, specificity is required before the court so that the defendant can defend himself adequately against claims of trade secret

misappropriation, and can divine the line between secret and non-secret information, and so that a jury can render a verdict based on a discriminating analysis of the evidence of disclosure and misappropriation.

Thus, where defendants challenge plaintiff's alleged trade secrets on the basis of vagueness and ambiguity, and plaintiff's opposition relies solely on a legal argument about the unavailability of such a challenge, summary judgment is granted in defendants' favor. This accounts for about seventy-seven of the approximately eighty-six alleged trade secrets challenged on this ground.

There remain nine or so alleged trade secrets that defendants claim are vague and ambiguous, and against which claims plaintiff has offered more than a citation to its rejected legal argument. As to these, the plaintiff has raised a triable issue of fact as to four: Secrets 1.1.b, 1.4, 2.A.1, and 3.A.10.[9]

2.    Not Secret

Defendants contend that the majority of the seventeen or so alleged trade secrets still in play after considering defendants' vagueness and ambiguity objections are not in fact

_____

[9]    The Percival Declaration's conclusory allegations concerning sit-up's continuing use of historical financial data are unavailing. See generally Bridgeway Corp. v. Citibank, 201 F.3d 134, 142 (2d Cir. 2000).

secret.  Having reviewed the parties' submissions regarding each
of these alleged trade secrets, save for three exceptions to be
discussed, plaintiff has failed to raise a question of fact
regarding the defendants' evidence that these alleged trade
secrets were publicly available and well-known in the industry.
Because "[m]atters of . . . general knowledge in an industry
cannot be appropriated by one as his secret," Speedry Chem. Inc.
v. Carter's Ink Co., 306 F.2d 328, 331 (2d Cir. 1962), summary
judgment in defendants' favor is appropriate on these alleged
trade secrets.

For example, Secret 1.1.a sought to protect "[a] daily
schedule prepared by the scheduling team," upon which the
producer of a falling-price auction relied.  The schedule
"contains information concerning each auction, including the
starting price, the target price, the quantity of units to be
sold, a minimum price recommendation, sales forecast, profit,
and margin information, and a product description."  The
undisputed evidence shows that these metrics were commonly used
by other channels in the interactive commerce industry to
schedule product sales.  Pursuant to the Second Circuit's ruling
in Speedry, these metrics cannot as a matter of law qualify as
trade secrets.[10]

---

[10]     To the extent sit-up's opposition to defendants' motion for
summary judgment on the secrecy of sit-up's alleged trade

As a second example, Secrets 4.1 through 4.3 describe sit-up's auction engine.  The engine contains an automated voice recognition program that facilitates the purchase process by using the caller's telephone number to search for an array of information about the caller's purchase history.  The engine also communicates information to a graphics machine to display to the viewer the number of units remaining in the auction, and to close the auction upon purchase of the final available product.  The undisputed evidence shows that voice recognition programs are used throughout the home shopping industry. Further, the fact that sit-up uses an automated mechanism to process inbound calls is readily apparent to anyone who calls

secrets turns on the principle that, where a party has actually obtained information via a confidential relationship, it cannot defend against a misappropriation claim by arguing that such information could have been obtained from public sources, that argument fails.  As noted above, in order to be protectable under the trade secret misappropriation doctrine, a piece of information or business method must first be a trade secret. But as the Second Circuit has established, matters of general knowledge in an industry are by definition not trade secrets. See Speedry, 306 F.2d at 331.  Accordingly, any information that was generally known in the television retailing industry cannot form the basis of sit-up's trade secret misappropriation claim, regardless of how defendants acquired it.

Moreover, the actual reliance principle sit-up cites is only salient in compilation or formula trade secret cases, where, as plaintiff notes, the issue is generally whether the defendant has "reverse engineered" the plaintiff's product to discern its constituent elements.  Indeed, the three precedential cases plaintiff cites in support of its argument all concern misappropriated compilations, processes, or formulas.  In the instant case, sit-up's compilation trade secret fails for reasons discussed above, which are entirely unrelated to the alleged means of defendants' acquisition.

the channel to purchase an item. Moreover, sit-up readily acknowledges that "customers would know that there was some mechanism which was linking the sale of items with the number displayed on screen." It further admits that "[t]he fact that the auction closes once the last unit is sold is readily ascertainable from watching" the auction, and that it is "readily ascertainable that [sit-up] must have a system that links all of the winning bidders with the lowest price bid for the item in question." Given these admissions by sit-up, it is impossible to discern what could possibly be secret about alleged Secrets 4.1 through 4.3.

Plaintiff has raised a triable issue of fact only as to the secrecy of Secrets 2.A.1,[11] 5.A.2 (second sentence),[12] and 5.A.5.[13] With regard to Secret 2.A.1, there is a triable issue

---

[11]  Secret 2.A.1 reads: "Sit-up measures price-drop's profitability by reference to daily contribution, which took into account three metrics: product margin (at the time, approximately 20%), telephony profits, and postage and packaging (P&P) profits."

[12]  Secret 5.A.2 reads: "Sit-up sold the same product in different formats -- rising-price and falling-price -- and, on average, the falling-price dynamic generated higher product contribution per minute for sit-up. This phenomenon existed because of: (i) the perception among customers that they are getting a better deal; and (ii) the impulse for customers to all in before 'missing out' on the product."

[13]  Secret 5.A.5 reads: "Customers preferred the falling-price experience over the rising-price experience because it was easier in that multiple bidding and maximum bids were no longer

of fact as to whether the profits derived from sit-up's postage and packaging and from telephony are readily ascertainable from watching the channel.  As to Secrets 5.A.1 and 5.A.2, although it is undisputed that the competitive advantage of the falling-price auction was known publicly, the defendants make no specific showing regarding customers' alleged preference for falling-price auctions due to its ease, the absence of a required maximum bid, the fact that customers no longer had to stay on the telephone until the end of the auction, their perception that they were getting a better deal, and their impulse to avoid "missing out."  Accordingly, there is an issue of disputed fact as to the secrecy of this particular information, and summary judgment is not granted.

It should be noted that plaintiff did not raise a triable issue of fact as to the secrecy of Secrets 1.1.b, 1.4, or 3.A.10, three of the four trade secrets challenged for vagueness and ambiguity, but which survived that challenge.  Because plaintiff has not raised a triable issue of fact as to their secrecy, summary judgment is granted on these claims in defendants' favor.

---

required (as in a rising price auction), and customers no longer had to stay on the phone until the end of the auction."

3.   Not Used

Only four alleged trade secrets remain at issue: Secrets 2.A.1, 5.A.2 (second sentence), and 5.A.5, which survived defendants' first two challenges, and Secret 1.2, which defendants challenge solely on the basis of non-use.  Defendants claim that they did not use Secrets 5.A.2 and 5.A.5 because they made the decision to launch iBuy as a falling-price channel for reasons other than those manifest in Secrets 5.A.2 and 5.A.5, which describe the bases for customers' preference for falling-price auctions.  Specifically, defendants claim that they launched iBuy as a falling-price channel due to technical problems with the auction engines they were developing for a mixed-format station.  In an effort to raise a question of fact, sit-up points to evidence that defendants' senior management preferred a falling-price auction because of their analysis of sit-up's "budgets and financial forecasts."  sit-up has not pointed, however, to any evidence that the defendants' decision to adopt the falling-price format was driven by those elements of Secrets 5.A.2 and 5.A.5 which have survived to this point of the analysis, i.e., the five identified reasons behind customers' preference for the falling-price auction.  Summary judgment on these alleged trade secrets is therefore granted.

Summary judgment is also granted in defendants' favor on Secrets 1.2[14] and 2.A.1. The undisputed facts show that the former AuctionWorld team had developed a controller with an automatic default condition for AuctionWorld's drop-it falling-price auction channel. There is thus no triable issue of fact as to defendants' use of sit-up's allegedly proprietary interest in such a controller. Indeed, sit-up's argument on this trade secret appears to turn on allegations that Peter Garriock, the former AuctionWorld Head of Information technology, had developed the controller in 2003 while working under a freestanding confidentiality agreement with sit-up. Defendants were not a party to that agreement, and it has no bearing on sit-up's trade secret claim. As to Secret 2.A.1, defendants claim that they did not use the secret because they did not measure profitability by reference to daily contribution, but rather by reference to product margin. sit-up has not disputed this contention; summary judgment is therefore granted to defendants.

In essence, sit-up has failed to see both the forest and the trees. It has failed to demonstrate that some particular

---

[14]     Secret 1.2 reads: "There is an automatic element of the 'price-drop' process wherein the system takes the start price (pre-determined by the scheduling team) and linearly decrements the price to a target price (also pre-determined by the scheduling team) over the 6-minute default auction period. This is the automatic default condition."

concatenation of individual elements comprised a "secret sauce" worthy of trade secret protection, and it has failed to demonstrate that any particular individual piece of information was worthy of trade secret protection.  Summary judgment is granted to defendants on sit-up's trade secret claim.

II.  Plaintiff's Breach of Contract Claim

In Count II of its complaint, sit-up alleges that defendants "breached the Non-Disclosure Agreement by . . . using the Trade Secret Material for a purpose other than evaluating a possible transaction with Plaintiff."  sit-up further alleges that defendants failed to comply with their contractual obligation to destroy or return Evaluation Material requested by sit-up, despite representations to the contrary.  Under New York law, a party alleging breach of contract must demonstrate (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.  <u>Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.</u>, 375 F.3d 168, 177 (2d Cir. 2004).  Both plaintiff and defendants have moved for summary judgment on this claim.  Both motions are granted in part.

A.  Legal Questions

As discussed above, under the terms of the NDA, defendants were required to use any "Evaluation Material" "solely for the purpose of evaluating a possible [t]ransaction" with sit-up.

The definition of "Evaluation Material" was broad and contained only four limited exceptions, covering (i) information that is or becomes generally available to the public, (ii) information that is or has been independently acquired or developed, (iii) information that was already within defendants' possession, and (iv) information that was received by defendants from a source other than sit-up.

The parties do not dispute the existence of the NDA or sit-up's adequate performance thereof. Their disagreement turns on defendants' alleged breach and sit-up's claimed damages, as well as the legal framework applicable to each of these prongs.

As to breach, defendants contend that they have not breached the NDA because "a non-disclosure agreement is unenforceable unless the challenged disclosure is a bona fide confidence, protected under the common law of trade secrets." This argument is untenable, and defendants have not cited any precedential authority to support it. Parties are free to contract for mutual protection beyond what the common law allows, and this contract is unambiguous in its definition of covered materials. The meaning of "Evaluation Material" "is not up for debate, as it is a term of art defined in the contract." Lee v. BSB Greenwich Mortg. Ltd. P'ship, 267 F.3d 172, 180 (2d Cir. 2001). There is no evidence to support defendants' contention that sit-up recognized that trade secret law and the

NDA were to be coextensive.  Indeed, the phrase "trade secret"
is nowhere mentioned in the relevant parts of the NDA.[15]

Also unsuccessful is defendants' attempt to expand the
NDA's exceptions to include material that is "stale" or
"inconsequential."  As noted above, the contract defines
"Evaluation Material" and explicitly articulates the term's
limited exceptions.  Because information that is "stale" or
"inconsequential" is not excepted from the meaning of
"Evaluation Material" in the contract language, those terms will
not now be written in.  Finally, relying on a term in the NDA
providing for expiration of the agreement after one year,
defendants argue that, construing the NDA as a whole, "it is
evident that the parties intended that no information, no matter
how confidential or sensitive as an initial matter, would be
considered so after one year."  This argument is meritless.  The
expiration provision governed the duration of the agreement, not
its substantive terms.  Had the parties intended to exclude
historical financial information from the definition of

---

[15]  Although the complaint uses the term "Trade Secret
Material" in pleading plaintiff's claim for breach of contract,
it is clear that plaintiff was merely using the term as
shorthand to describe the universe of information it believed
was confidential and proprietary.  Moreover, unambiguous
contracts, such as this one, are to be interpreted according to
their own terms, without reference to extrinsic evidence.  See
Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir.
2005).

"Evaluation Material," they could have done so. The agreement

does not, as defendants contend, "specifically exempt[] outdated

disclosures." It merely limits its own duration.

With regard to damages, defendants contend that sit-up's

breach of contract claim fails as a matter of law because sit-up

has failed to demonstrate the existence of damages, an element

of the claim under New York law. But under New York law,

"nominal damages are always available for breach of contract."

T&N PLC v. Fred S. James & Co. of N.Y., 29 F.3d 57, 60 (2d Cir.

1994). Because sit-up has only moved for summary judgment on

the issue of defendants' liability for breach of contract, the

availability of nominal damages for breach satisfies the fourth

element of the claim. The amount of damages is an issue of fact

for the jury at trial.[16]

Finally, sit-up rests much of its opposition to defendants'

motion for summary judgment on defendants' alleged failure to

---

[16]    The only precedential case defendants cite in support of
their position is First Investors Corp. v. Liberty Mut. Ins.
Co., 152 F.3d 162 (2d Cir. 1998), which they contend stands for
the proposition that a breach of contract claim must be
dismissed where the party claiming breach "cannot prove
damages." Id. at 169. It is unclear whether the defendants in
that case, advancing a breach of contract counterclaim, sought
nominal damages, as plaintiff does here. Without more, the
court's general statement "that Liberty Mutual cannot prove
damages because Liberty Mutual has succeeded in avoiding a duty
to defend," id., is unpersuasive in light of the Second
Circuit's repeated insistence that nominal damages are available
in breach-of-contract actions.

adduce evidence that they did not actually rely on "Evaluation Material" in launching iBuy. This argument appears to confuse the law of trade secret misappropriation with the law governing the instant claim for breach of contract. In the law of trade secret misappropriation, "[i]t is no defense . . . that the [alleged trade secret] could have been developed independently, without resort to information gleaned from the confidential relationship." Imperial Chem., 342 F.2d at 743.[17] But the definition of "Evaluation Material" in the NDA specifically countenances the possibility that certain material would "become[] generally available to the public," and exempts that material from its coverage. Thus, in breach of contract claims arising out of this NDA, it is a defense that the material in question was generally available to the public, regardless of how defendants actually acquired it. The one case sit-up cites in support of its position, Monovis, Inc. v. Aquino, 905 F. Supp. 1205, 1207 (W.D.N.Y. 1994), is a trade secret case and does not address a breach of contract claim.

---

[17] As discussed above, see supra n.10, information that is "generally available to the public" does not qualify as "trade secret" material in the first place.

B.   Particular Breach Allegations

sit-up has identified six instances of defendants' alleged use of "Evaluation Material," in breach of the NDA.[18]   Each of these shall be treated in turn.   In addition, sit-up alleges that defendants failed to return or destroy "Evaluation Material," as they were obligated to do under the NDA.

1.   Watson's December 8, 2004 Email

In a December 8, 2004 email exchange with Michael Pekowsky, John Watson rebuffed Pekowsky's assertion that customer and regulatory confidence in electronic retailing might dwindle in the wake of AuctionWorld's bankruptcy.   Watson wrote that Pekowsky's negative prognostications "may not be true if you look at current Sit-up sales growth . . . ."   sit-up claims that this reference to its sales growth is evidence of defendants' use of "Evaluation Material."   It is undisputed, however, that on December 6, sit-up had issued a press release stating that it

---

[18]   Plaintiff's brief provides a narrative description of the various ways in which it alleges defendants breached the NDA. Defendants helpfully group the various allegations into seven alleged uses, and plaintiff in its reply brief does not object either to defendants' taxonomy or their description of the claims.   Accordingly, defendants' list of the seven alleged uses will structure this analysis, with one exception.   The "Second Alleged Use" –– that defendants used Evaluation Material "to reject the 'mixed play' format strenuously recommended by the former AuctionWorld team in favor of the falling-price format that was identical to price-drop in every material way" –– subsumes the six other identified alleged uses.   It is therefore redundant and need not be considered alongside the six other, more particularized alleged uses of Evaluation Material.

"has been named the fastest growing TV provider in the UK . . . and is set to generate over £220 million in sales revenue in 2004 alone." Because this information became "generally available to the public other than as a result of the breach of this Agreement by the Receiving Party or its Representatives," it falls within the first enumerated exception to the definition of "Evaluation Material" and was not covered by the NDA. Summary judgment on this claim is granted in defendants' favor.

  2. February 7, 2005 McInerney Email

  In a February 7, 2005 email to Barry Diller regarding the status of iBuy, Thomas McInerney referred to the "history of auction shopping in the UK," and stated that "Sit-Up has ramped to Stg. 200mm+ top-line/Stg. 12mm EBITDA in just over three years." sit-up claims that McInerney's use of this information was impermissible under the NDA. But it is undisputed that in the spring of 2005, sit-up publicly disclosed that its sales had "scorched to £207m, with profits of £12.5 m." Because this information "bec[a]me[] generally available to the public other than as a result of the breach of this Agreement by the Receiving Party or its Representatives," it falls within the first enumerated exception to the definition of "Evaluation Material" and was not covered by the NDA. Summary judgment on this claim is granted in defendants' favor.

### 3.   February 8, 2005 Curtis Email

On February 8, 2005, Terry Curtis sent an email in which he discussed the "[c]ompetitive situation" surrounding the launch of iBuy.  The email explained that defendants "have not put a lot of time documenting the competitive environment as we had sufficient information and knowledge based on our most recent sets of due diligence."  sit-up claims that the "due diligence" to which Curtis referred was defendants' due diligence of sit-up, and that basing its competition analysis for the launch of iBuy on sit-up due diligence was a breach of the NDA.

Curtis's reference to "due diligence" is ambiguous. Defendants offer evidence that it is a reference to their recent due diligence on AuctionWorld and their ongoing analysis of the "distance retailing market" in Britain.  For its part, sit-up makes no effort to show that the reference to "information and knowledge" is a reference to "Evaluation Material" within the meaning of the NDA.  A factfinder could not determine that this generically categorized information was "Evaluation Material" without any evidentiary support from the plaintiff, whose burden it is to put forth some admissible evidence to defeat defendants' motion for summary judgment on this claim. Accordingly, summary judgment is granted in defendants' favor on this alleged breach.

4.    February 15, 2005 Curtis Email

A February 15, 2005 email from Terry Curtis to John Watson, attached to which was defendants' three-year forecast plan for iBuy, contained repeated reference to sit-up data.  Curtis stated that an attached market outlook was "based on '02 data from Sit-up . . . and forecast data from Sit-up matched against iBuy revenues (net)"; he "used the market information from '02 (provided as part of the Sit-up due diligence)"; he extrapolated market data based on, inter alia, "Sit-up's nums through '04"; an estimate was "reasonable given what we know and expect based on Q and Sit-up"; and that many changes made to the proposal from a previous incarnation "were based on the Sit-up actual experience."  Because there are triable issues of fact as to whether Curtis used Evaluation Material in composing defendants' three-year plan, summary judgment cannot be granted either to the plaintiff or the defendants.

sit-up does not specifically identify what Evaluation Material Curtis relied upon in creating the three-year plan, and defendants contend that much if not all of the information upon which Curtis likely relied was generally available to the public, and therefore outside the scope of the NDA.  The definition of "Evaluation Material" articulated in the NDA, though quite broad, was subject to four important exceptions. Accordingly, it was incumbent upon sit-up, in moving for summary

judgment, to establish that there is no issue of disputed fact as to whether the material alleged to underlie defendants' breaches of the NDA was "Evaluation Material."  It has not done this, but nor have defendants fully shouldered their burden to demonstrate that all of the specifically identified financial information fell within one of the exceptions or was not "Evaluation Material."[19]

    5.  Curtis and Kirschner's July 2005 "Follow Up"

    Following a July 19, 2005 meeting with Tom McInerney to discuss iBuy's performance during its three-month test period, Terry Curtis and Andrea Kirschner addressed certain "follow-up items."  These items referenced sit-up's confidential sales and cost information for its first three years of operation (2001-2003), which allowed Curtis and Kirschner to calculate sit-up's gross profit margin and then to compare their calculations with iBuy's early financial results and projections.  Because there is no disputed issue of material fact as to whether this constituted a breach of the NDA, summary judgment is granted in sit-up's favor.

    Defendants first contend that the sit-up information referenced by Curtis and Kirschner falls outside the aegis of

_____

[19]    In contrast to the February 8 email, the February 15 email makes unambiguous use of data concerning sit-up.  Consequently, while summary judgment was appropriately granted to defendants for the claim based on the former, it must be denied with respect to the latter email.

the NDA because it was "merely stale and obsolete sales and cost data." But the NDA contains no exception for stale and obsolete data, and thus the information at issue is properly regarded as Evaluation Material.[20] Second, defendants argue that sit-up "has no evidence to support its bare assertion that Defendants used this stale financial data in order to 'green-light' iBuy." But the NDA prohibits <u>any</u> "use" of the Evaluation Material. Defendants do not dispute that Curtis and Kirschner used the data in preparing financial projections for iBuy, a purpose other than considering a transaction with sit-up. While the extent of their use, and the role the document played in McInerney's "green-lighting" iBuy, might be relevant to a calculation of damages, it has no bearing on the determination of defendants' liability for bare use of the information. There is thus no disputed issue of material fact that they breached the NDA in this respect.

6. July 2005 PowerPoint Presentation

The final PowerPoint presentation made to McInerney in July 2005 contained references to sit-up's cancellation rates, return

---

[20]    In a footnote, defendants assert that plaintiff's gross profit margin is calculable from information contained in its publicly filed reports. The two paragraphs in defendants' Rule 56.1 statement to which they cite, however, state only that sit-up was required to file public financial reports, and that those reports were true and accurate. This does not suffice to raise a triable issue of fact as to the public availability of the information in question.

rates, cost of goods sold, and gross profit as a percentage of floor sales, all based on sit-up's actual experience in 2004. Indeed, the footnote to the graph states that it was modeled on sit-up's "FY04 results," the details of which the defendants have not claimed were publicly available.

Defendants contend that sit-up "fails to provide any evidence to support its position that the information on this lone page was confidential information that Defendants acquired from Plaintiff." The footnote referring to "Sit-up modeled on FY04 results" is sufficient standing alone to identify the information's provenance. But more importantly, it is undisputed that information concerning sit-up's cancellations, returns, and net cost of product sales was not made public, indicating that defendants' reliance on that information was only made possible by disclosures from sit-up. The undisputed facts thus show that defendants used proprietary information acquired from sit-up for a purpose other than considering a transaction with sit-up. Accordingly, summary judgment is granted in plaintiff's favor.

7.  Destruction of "Evaluation Material"

sit-up alleges that defendants used, or at the very least possessed, "Evaluation Material" even after Tom McInerney repeatedly represented to sit-up that the material had been destroyed pursuant to the terms of the NDA. By letter to IAC

dated March 8, 2005, sit-up formally requested destruction of all "Evaluation Material" under Section 5 of the NDA. On March 14, Tom McInerney replied, stating that defendants "have not breached any of our obligations" under the NDA and "have destroyed all Evaluation Material in our possession." On March 18, sit-up sent another letter to IAC requesting "unequivocal confirmation" that IAC was in full compliance with the NDA. McInerney replied and "reconfirm[ed]" IAC's position.

Defendants do not dispute plaintiff's allegations; indeed, in their brief in opposition to sit-up's motion for partial summary judgment, they acknowledge that they "inadvertently retained certain items of Evaluation Material following receipt of a destruction request from Plaintiff in March 2005." Summary judgment in plaintiff's favor is granted with respect to this breach, as no issue of disputed fact exists as to whether defendants failed to comply with the terms of the NDA. Defendants' inadvertence is irrelevant, as the NDA contains no scienter requirement.

III.     Plaintiff's Breach of Implied Covenant Claim

sit-up next claims that defendants breached the implied covenant of good faith and fair dealing, which sit-up claims is implicit in all contracts governed by New York law. Defendants rightly argue that this claim is redundant to sit-up's breach of contract claim, and must be dismissed.

Under New York law, breach of the implied duty of good faith and fair dealing "is merely a breach of the underlying contract." <u>National Market Share, Inc. v. Sterling Nat. Bank</u>, 392 F.3d 520, 525 (2d Cir. 2004) (citation omitted). Because the duty to act in good faith under a contract derives from the contract itself, "breach of an implied covenant of good faith and fair dealing is intrinsically tied to the damages allegedly resulting from a breach of the contract." <u>Canstar v. J.A. Jones Constr. Co.</u>, 622 N.Y.S.2d 730, 731 (App. Div. 1st Dep't 1995). Accordingly, "[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." <u>William Kaufman Org., Ltd. v. Graham & James LLP</u>, 703 N.Y.S.2d 439, 442 (App. Div. 1st Dep't 2000).

sit-up has made no effort to distinguish its claim for breach of the covenant of good faith and fair dealing from its breach of contract claim. Rather, sit-up observes that under the covenant of good faith and fair dealing, "a party may be liable for frustrating the essential purpose of a contract, even where no specific contractual provision has been breached," and argues that, even if it were determined that no specific contractual provision was breached, defendants must be held liable because "the essential purpose of the NDA -- to allow sit-up to freely disclose confidential information to facilitate a potential acquisition -- would have been frustrated." But

this argument merely restates sit-up's breach of contract claim and seeks to hold defendants liable for their use of allegedly confidential information.  Where defendants made use of confidential "Evaluation Material," they breached the contract; where the material was not confidential, or defendants made no such use of it, they did not breach the contract, either in its letter or in its "essential purpose," and thus did not breach the implied covenant of good faith and fair dealing.  This claim fails as a matter of law and is dismissed.

IV.     Plaintiff's Unfair Competition Claim

sit-up next alleges that defendants' use of the material collected through due diligence constitutes unfair competition under New York law.  In the Second Circuit's most fulsome discussion of the tort, the court observed:

> New York courts have noted the incalculable variety of illegal practices falling within the unfair competition rubric, calling it a broad and flexible doctrine that depends more upon the facts set forth than in most causes of action.  It has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor, and misappropriating for the commercial advantage of one person a benefit or property right belonging to another.  The tort is adaptable and capacious.

Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia, 672 F.2d 1095, 1105 (2d Cir. 1982) (citation and alteration omitted).

Defendants contend that this claim must fail as a matter of law because sit-up's unfair competition claim must "rise and fall" with its trade secrets misappropriation claim. But there is no reason to believe that this "adaptable and capacious" tort, id., is isometric with the tort of trade secret misappropriation. Indeed, while defendants have cited no precedential authority in support of their position, several New York courts have recognized that the claims are freestanding, and a claim for unfair competition may lie even when no trade secret has been misappropriated. See, e.g., Leo Silfen, Inc. v. Cream, 278 N.E.2d 636, 639 (N.Y. 1972) (casual memory of customer names insufficient to constitute unfair competition); Continental Dynamics Corp. v. Kanter, 408 N.Y.S.2d 801, 802 (App. Div. 2d Dep't 1978) (physical taking and studied copying of consumer lists).

Because the gravamen of sit-up's unfair competition claim is the improper "use" of material collected through the defendants' due diligence, it is necessary to analyze this claim through the prism of the NDA. The parties contractually defined what would constitute an impermissible use of information that sit-up provided to the defendants, and specifically licensed the defendants to use information that was already circulating in the public domain. Moreover, it is undisputed that HSN informed sit-up that HSN was interested in entering the British

marketplace regardless of whether the parties ultimately agreed on an acquisition deal. Imposing any restrictions broader than those imposed by the NDA on defendants' commercial activity through the doctrine of unfair competition is unwarranted. In its breach of contract claim, sit-up identified the uses of its information which it considered actionable. The rulings on the defendants' summary judgment motion for the breach of contract claims will therefore be applied wholesale to defendants' challenge to sit-up's unfair competition claim.

V.      Plaintiff's Misappropriation of an Idea Claim

        sit-up's fifth and final claim is for misappropriation of an idea. According to the complaint, that idea is:

> the unique methods of selling products profitably at
> an unknown, falling price, and the price modeling and
> product identification techniques used to determine
> (i) the rate at which auction prices should fall, the
> target selling price, and the minimum selling price,
> (ii) the magnitude of the price drop, and (iii) the
> type and quantity of products to be sold.

Essentially, sit-up alleges that defendants misappropriated its "secret sauce." To succeed on such a claim under New York law, a party must prove (1) the existence of a legal relationship between the parties in the form of a fiduciary relationship, an express or implied-in-fact contract, or quasi-contract; and (2) the idea must be novel and concrete. McGhan v. Ebersol, 608 F. Supp. 277, 284 (S.D.N.Y. 1985) (citing Vantage Point, Inc. v. Parker Bros., Inc., 529 F. Supp. 1204, 1216 (E.D.N.Y.), aff'd

52

without op. sub. nom. <u>Vantage Point, Inc. v. Milton Bradley</u>, 697

F.2d 301 (2d Cir. 1982)).  Defendants' motion for summary

judgment on this claim is granted because of plaintiff's failure

to describe its idea with sufficient concreteness.

In opposing summary judgment on an idea misappropriation

claim, the plaintiff, "who bears the burden of coming forward

with proof of novelty, cannot rest on mere assertions of novelty

and originality, but must instead demonstrate some basis in fact

for those claims."  <u>Paul v. Haley</u>, 588 N.Y.S.2d 897, 903 (App.

Div. 2d Dep't 1992) (citation omitted).  In the related context

of submission-of-idea misappropriation, the Second Circuit

observed that

> [t]he determination of whether an idea is original or
> novel depends upon several factors, including, <u>inter
> alia</u>, the idea's specificity or generality (is it a
> generic concept or one of specific application?), its
> commonality (how many people know of this idea?), its
> uniqueness (how different is this idea from generally
> known ideas?), and its commercial availability (how
> widespread is the idea's use in the industry?).

<u>Nadel v. Play-By-Play Toys & Novelties, Inc.</u>, 208 F.3d 368, 378

(2d Cir. 2000).

Analysis of sit-up's claim need not proceed farther than

the first of these factors.  For the reasons described in

connection with the discussion of the trade secret claim, sit-

up's idea misappropriation claim fails because it has failed to

discuss its allegedly misappropriated idea with any

concreteness.  There is simply no way to determine whether defendants misappropriated sit-up's "secret sauce" for running a successful falling-price auction channel when sit-up has failed entirely to limn even its roughest contours.  The complaint's description of sit-up's allegedly misappropriated idea is the most fulsome description sit-up has offered.  It has never amplified that claim in any way, even in response to defendants' motion for summary judgment and their specific claims that the idea alleged is neither novel nor original, or that the idea became public once sit-up launched price-drop.

To the extent sit-up contends broadly that its "idea" was the falling-price television auction, its claim fails because undisputed facts show that, at the very latest, bid.com had developed a falling price auction system in 1999.  To the extent sit-up seeks to differentiate its business idea from bid.com's by arguing that its own channel was successful, that claim fails because it has not adduced any evidence that its success was attributable to any particular innovation on its part.  sit-up having raised no triable issue of fact, summary judgment is granted in defendants' favor.

VI.  sit-up's Adverse Inference Request

Finally, sit-up requests an adverse inference based on disclosures made by defendants during discovery regarding their failure to retain certain repositories of emails exchanged among

HSN employees.  A party seeking an adverse inference instruction

based on the destruction of evidence must establish

> (1) that the party having control over the evidence
> had an obligation to preserve it at the time it was
> destroyed; (2) that the records were destroyed with a
> culpable state of mind; and (3) that the destroyed
> evidence was relevant to the party's claim or defense
> such that a reasonable trier of fact could find that
> it would support that claim or defense.

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99,

107 (2d Cir. 2002) (citation omitted).  This discussion need not

be long.  There is no evidence that defendants acted negligently

or in bad faith in their efforts to comply with sit-up's

discovery requests.  Over the course of discovery of truly awe-

inspiring proportions, defendants made comprehensive efforts to

produce requested documents and to remedy any document retention

problems of which they became aware.  sit-up's request for an

adverse inference is denied as a matter of law.

CONCLUSION

For the foregoing reasons, defendants' October 3 motion for

summary judgment is granted in part and sit-up's October 3

motion for partial summary judgment is granted in part.

Defendants' motion is granted with respect to sit-up's claims

for trade secret misappropriation, breach of the implied

covenant of good faith and fair dealing, and misappropriation of

an idea.  The defendants' motion is also granted with respect to

sit-up's breach of contract claim stemming from Watson's

December 8, 2004 email, McInerney's February 7, 2005 email, and
Curtis's February 8, 2005 email. The defendants' motion for
summary judgment on the unfair competition claim is granted
except for that portion of the claim that stems from Curtis's
February 15, 2005 email, Curtis and Kirschner's July 2005
"Follow Up," and the July 2005 PowerPoint presentation.

sit-up's motion for partial summary judgment on its breach
of contract claim is granted with respect to Curtis and
Kirschner's July 2005 "Follow Up," the July 2005 PowerPoint
presention, and defendants' failure to destroy "Evaluation
Material" upon sit-up's request. Both motions for summary
judgment are denied with respect sit-up's breach of contract
claim arising from Curtis's February 15, 2005 email. Finally,
sit-up's request for an adverse inference is denied as a matter
of law.

Dated:    New York, New York
          February 20, 2008

                              _____
                                    DENISE COTE
                              United States District Judge